G. & C. MERRIAM CO.,
Plaintiff-Appellee,

v.

WEBSTER DICTIONARY COMPANY,
INC. et al., Defendants-Appellants.

No. 80–1151.

United States Court of Appeals,
First Circuit.

Argued Sept. 8, 1980.

Decided Dec. 22, 1980.

Donald G. McGrath, Buffalo, N. Y., with whom McGrath, Meyer, Liberman & Lipp, P.C., Buffalo, N. Y., and Paul A. Manoff, Boston, Mass., were on brief, for defendants-appellants.

Edward R. Lev, Boston, Mass., with whom Louis A. Rodriques, and Sullivan & Worcester, Boston, Mass., were on brief, for plaintiff-appellee.

Before COFFIN, Chief Judge, WYZAN-SKI, Senior District Judge,* and KEETON, District Judge.**

KEETON, District Judge.

By judgment dated February 7, 1980, appellants Webster Publishing Company, Ltd., Webster Home Mailing Service, Ltd., and Webster Home Mailing Service, Inc. (collectively, "Webster Publishing") and George W. Hoskins were held in contempt of court for violation of an injunction issued by the district court on October 27, 1977, and were assessed a fine, jointly and severally, in the amount of $50,000. They now appeal from that judgment, challenging the validity of the injunction and arguing that they did not violate it, that they were not bound by it, and that the fine cannot be sustained under theories of either civil or criminal contempt.

### I.

This action arose out of a trademark dispute involving advertisements for various "Webster" dictionaries placed by two brothers and their several closely-held corporations. In December, 1975, Plaintiff-Appellee G. & C. Merriam Co. ("Merriam") brought an action in the district court against Webster Dictionary Company, Inc., a/k/a John Hoskins Sales Agency ("Webster Dictionary Company"), alleging that certain advertisements for dictionaries placed by Webster Dictionary Company violated the Lanham Act, 15 U.S.C. § 1125(a), and Mass.Gen.Laws ch. 93A, and constituted unfair competition. Merriam charged that Webster Dictionary Company's advertisements contained false and deceptive statements deliberately calculated to mislead the public into believing that the dictionaries offered by defendants were Merriam's higher quality "Webster's Third New International Dictionary Unabridged" and that the advertisements violated Merriam's trademark rights. Merriam sought damages and injunctive relief.

On January 28, 1976, Merriam moved for a preliminary injunction to restrain Webster Dictionary Company from placing further advertisements suggesting that the dictionaries offered by Webster Dictionary Company were the Merriam dictionary. After a hearing, the district court by Memorandum and Order of May 19, 1976 denied Merriam's request for preliminary relief on the ground that "the defendant's voluntary amendment of the advertisement makes unnecessary the issuance of a preliminary injunction."[1]

Subsequently, Merriam attempted to conduct discovery through depositions, requests for documents, interrogatories, and requests for admissions. Webster Dictionary Company failed to respond to Merriam's discovery requests. On March 21, 1977 Webster Dictionary Company informed the district court by letter that it was discharging its attorneys by reason of its insolvency, and that Webster Dictionary Company "was willing to consent to the entry of an appropriate judgment against it." On April 25, 1977, the case was called for trial. Web-

---

* Of the District of Massachusetts, sitting by designation.

** Of the District of Massachusetts, sitting by designation.

1. The district court in its memorandum also noted that "plaintiff does not have the exclusive right to refer to its product as 'Webster Dictionary.' *G. & C. Merriam Company v. Syndicate Publishing Co.*, 237 U.S. 618, 622, 35 S.Ct. 708, 709, 59 L.Ed. 1148 (1915)," and that "[w]hile it may be a considerable overstatement to describe the defendant's dictionary as world-famous, these words do not suggest that the book being sold is the plaintiff's dictionary."

ster Dictionary Company failed to appear by counsel.[2]

The district court, holding that Webster Dictionary Company had defaulted, proceeded with a hearing on damages. Merriam's counsel later submitted a proposed form of permanent injunction and judgment. On October 27, 1977, the district court issued findings of fact and entered a default judgment for Merriam against Webster Dictionary Company, granting the requested injunctive relief and awarding Merriam damages, costs and, attorneys' fees totaling $75,169.19. The injunction permanently enjoined Webster Dictionary Company[3] and its "officers, directors, principals, servants, employees, consultants, agents, attorneys, representatives, successors, and assigns, and others acting in association therewith, including, but not limited to, John P. Hoskins and Thomas H. Lucas" from, *inter alia*, "publishing, advertising, offering for sale or selling, or causing to be published, advertised, offered for sale or sold, any publication by means of any one or more of the following descriptions, titles, representations:"

  \*  \*  \*  \*  \*  \*

(7) as to any publication or trade name described or identified by the word "Webster" (or any variant thereof), any of the following descriptions or representations:
 (a) world-famous
 (b) authentic
 (c) original
 (d) genuine
 (e) renowned
 (f) any variant of (a)–(e) above
 (g) any other word or combination of words used to imply the meaning of one or more of (a)–(e) above. . . .

Webster Dictionary Company failed to file a timely appeal from the district court's judgment.[4]

On August 2, 1979, Merriam moved for the issuance of an order to show cause and for a contempt order, alleging in substance that George Hoskins and the three corporations referred to herein as Webster Publishing were bound by the district court's injunction of October 27, 1977, and that they had violated the injunction by the manner in which they had advertised various dictionaries, encyclopedias, and a home mailing service. In particular Merriam complained of appellants' use of an illustration of Noah Webster, captioned as "the inspiration for the founding of our company," the description of appellants' "Webster" dictionaries and encyclopedias as, *inter alia*, "authoritative," and the description of Webster Publishing as, *inter alia*, "world famous." The district court issued an order to show cause requiring John Hoskins, George Hoskins, and Webster Publishing to show why they should not be held in civil contempt for failure to comply with the injunction. Thomas H. Lucas was not named in the show cause order.

After some discovery, a hearing on Merriam's Motion for Contempt was held on October 11, 1979, at which appellants were represented by counsel. Merriam's Motion for Contempt was dismissed by agreement as to John Hoskins, formerly president of Webster Dictionary Company, because he had left Webster Dictionary Company in 1977 and was not associated with appellants or their alleged contempt. The court heard argument on whether appellants were bound by and had violated the injunction, and heard some evidence concerning Mer-

---

**2.** Thomas Lucas, a "consultant to the defendant," attended the hearing and testified briefly, but as Lucas was not an attorney he was not permitted to represent Webster Dictionary Company.

**3.** The district court's order named "Webster Reference Books, Inc. (formerly The Webster Dictionary Company, Inc.), John Hoskins Sales Agency, Ltd., . . . ."

**4.** On December 30, 1977, after the appeal period had expired, Webster Dictionary Company moved, through its then-president E. R. Eilers, for leave to file a late notice of appeal. The district court denied the motion for the reasons that the purported appeal was frivolous, that no sufficient excuse for the delay had been offered, and that Mr. Eilers (not a lawyer) had no standing to represent the defendant corporation. This court affirmed the denial and dismissed the appeal on March 15, 1978.

riam's damages, but noted that if the court found appellants had violated the injunction an additional hearing on damages would probably be held. The court indicated that it intended to decide the question whether appellants were in contempt on the basis of the deposition of George Hoskins and documents offered in evidence by Merriam and stipulated to (except with respect to relevance) by appellants, consisting primarily of documents relating to incorporation and interests in Webster Publishing and copies of the challenged advertisements of Webster Publishing.

On January 25, 1980, the district court issued its Findings, Ruling and Order on Merriam's motion for contempt. The court found as facts that (1) appellants had been duly served; (2) appellants were "successors of the original defendant or persons acting in concert with it"; (3) George Hoskins was a "key employee" of Webster Dictionary Company and "the principal" of the corporate appellants, Webster Publishing; (4) George Hoskins had actual knowledge of the terms of the original injunction; and (5) appellants' use of the words "world-famous" and "authoritative" in their advertisements violated the injunction. Based on these findings, the court held that appellants were bound by the injunction issued against Webster Dictionary Company and that appellants were thus in contempt of court. On February 7, 1980, the district court entered a contempt judgment against appellants, including an order that they pay to Merriam a fine in the amount of $50,000, with interest from January 25, 1980. From that judgment they appeal.

## II.

Central to the determination of the legal questions presented by this case is an understanding of the relationship among John and George Hoskins, the two groups of closely-held reference book marketing companies (collectively referred to as Webster Dictionary Company and Webster Publishing, respectively), and the offending ad-

vertisements.[5] John Hoskins incorporated the original defendant, Webster Dictionary Company, in 1975, and was its president and sole shareholder until about March 1, 1977, at which time he left the reference book business. George Hoskins began working with his brother John for Webster Dictionary Company in 1975, as general sales manager. Webster Dictionary Company's business was to solicit mail-order sales of various dictionaries through advertisements in newspapers and periodicals in the United States and Canada, which orders were forwarded to the actual publishers, who shipped directly to the customer.

Although the record is not altogether clear on the point, it could be reasonably inferred that in Webster Dictionary Company's activities John Hoskins was in charge, that George Hoskins was the next most active person in the operation, and that corporate formalities were not rigorously observed.

Webster Dictionary Company operated out of the adjacent apartments of John and George Hoskins in Toronto, Canada. At most it had about six employees. George Hoskins, as general sales manager, was responsible for all aspects of Webster Dictionary Company's advertising and sales, including the design, preparation and placement of advertisements. Although there was no written agreement as to George's compensation, he received a "draw" that varied on occasion based on his personal needs, and he expected to share in the corporation's profits, an expectation based on George's "relationship with [his] brother." Nevertheless, no evidence was before the court to show that George was an "officer," director, or shareholder of Webster Dictionary Company.

Webster Dictionary Company never got off the ground financially, and it went out of business some time in late 1977. George Hoskins continued to be employed by Webster Dictionary Company until about May, 1977, and had continuing contacts with it thereafter.

---

**5.** Except for the uncertainties noted, the facts stated here, taken primarily from the deposition of George Hoskins, appear not to be in dispute.

At some time in mid-1976, George Hoskins, while still employed by Webster Dictionary Company, started Webster Publishing as a sole proprietorship. In March, 1977, George Hoskins incorporated three related corporations, collectively referred to herein as Webster Publishing. John Hoskins apparently had nothing to do with Webster Publishing; George was clearly the principal operator of the business and he was sole incorporator, president and a director of each of the related corporations. His wife was sole shareholder.

Webster Publishing's business bears a striking resemblance to that of Webster Dictionary Company: mail order sales of reference books (dictionaries and encyclopedias) through advertisements placed in newspapers and periodicals.[6] These advertisements, which were placed and either commissioned or designed by George Hoskins, used a number of the same types of "sales pitches" as those of Webster Dictionary Company (e. g., substantial advertised discounts attributed to "the recession," a photograph of Noah Webster, descriptions of Webster Publishing as "world famous," "authoritative," "America's foremost dictionary company," etc.). Webster Publishing's offending advertisements began to appear in late 1977, and continued through mid-1979. Thomas Lucas, who served as "legal consultant" to Webster Dictionary Company and was specifically named in the injunction, continued to serve in that capacity for Webster Publishing.

### III.

◼ Ordinarily the validity and terms of an injunction are not reviewable in contempt proceedings. *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 833 (2d Cir. 1930). They may be challenged only on appeal in the original proceeding and not by collateral attack. *See A.M.F. Inc. v. International Fiberglass Co., Inc.*, 469 F.2d 1063, 1065 (1st Cir. 1972); *NLRB v. Local 282, Teamsters*, 428 F.2d 994, 999 (2d Cir. 1970). *But cf.* 11 C. Wright & A. Miller, Federal Practice and Procedure § 2960, at 597 (1973) (suggesting that an exception should be made where "there was no opportunity for effective review of the order before it was violated").

◼ In this case, the injunction was entered by default judgment, when Webster Dictionary Company did not appear at trial, after it had previously indicated it would consent to "an appropriate judgment against it." A judgment entered in these circumstances is a judgment on the merits and, in relation to liability as distinguished from damages,[7] ordinarily has the same legal effect between the parties and their privies as a judgment rendered after a fully-contested trial. *Trans-World Airlines, Inc. v. Hughes*, 449 F.2d 51, 63–64, 69 (2d Cir. 1971), *rev'd on other grounds*, 409 U.S. 363, 92 S.Ct. 960, 30 L.Ed.2d 75 (1973). Here, Webster Dictionary Company failed effectively to exercise its right of appeal. Thus, Webster Dictionary Company and its privies cannot now challenge the injunction on the merits.

### IV.

The principles stated in Part III constrain only those who are bound by an injunction. Persons beyond its scope *cannot* be held to have violated it because it does not apply to them. They are "free to ignore it." *Alemite, supra*, 42 F.2d at 832. Therefore, this case turns on whether appellants were properly held to be bound by the district

---

6. According to George Hoskins, Webster Publishing was originally conceived to sell dictionaries via television advertisements shown in Canada, which it did in 1976 and early 1977. Webster Publishing's printed advertisements, the asserted basis for contempt, were initiated in late 1977. One of the corporate appellants, Webster Home Mailing Service, solicits dictionary and encyclopedia sales by direct mail.

7. Although a default judgment conclusively establishes the defendant's liability, damages cannot be assessed without a hearing at which plaintiffs must "establish the extent of their damages resulting from defendant's violations." *Eisler v. Stritzler*, 535 F.2d 148, 153–54 (1st Cir. 1976). In the instant case, a hearing on Merriam's damages as against Webster Dictionary was held on April 25, 1977, which provided the basis for the district court's October 27, 1977 Findings of Fact.

court's injunction of October 27, 1977, even though they were not parties to the original action and were not named in the injunction.

The limitations on a court's power to bind nonparties and to hold the latter in contempt were succinctly stated in the opinion of Judge Learned Hand in *Alemite, supra.*

> [A court] cannot lawfully enjoin the world at large, no matter how broadly it words its decree. If it assumes to do so, the decree is pro tanto brutum fulmen, and the persons enjoined are free to ignore it. It is not vested with sovereign powers to declare conduct unlawful; its jurisdiction is limited to those over whom it gets personal service, and who therefore can have their day in court. Thus, the only occasion when a person *not a party* may be punished, is when he has helped to bring about, not merely what the decree has forbidden, because it may have gone too far, but what it has the power to forbid, the act of a party. This means that the respondent must either *abet the defendant, or must be legally identified with him.* . . .
>
> Thus, if the defendant is not involved in the contempt, [his] employee cannot be; the decree has not been disobeyed, so far as it is valid.

42 F.2d at 832–33 (emphasis added).

■ To hold a nonparty bound by an injunction it is thus essential to prove either that the nonparty participated in the contumacious act of a party or that the nonparty was subject to the injunction because legally identified with a party.

## A.

Did appellants participate in the contumacious act of a party?

■ Proof of a relationship to the pre-injunction act of a party may be circumstantially suggestive, but a nonparty, if not legally identified with a party, can be found to be in contempt only if in active concert or participation with a party in postinjunction activity. *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14–15, 65 S.Ct. 478, 481,

89 L.Ed. 661 (1945); Fed.R.Civ.P. 65(d); *see Vuitton et Fils, S.A. v. Carousel Handbags*, 592 F.2d 126, 129–30 (2d Cir. 1979); 7 Moore's Federal Practice ¶ 65.13 (2d ed., 1980 rev.); 11 C. Wright & A. Miller, Federal Practice and Procedure § 2956 (1973). Thus, a key principle in cases binding a nonparty who is not legally identified with a party is that a person properly named in the injunction must have had a material role in the subsequent violation of that injunction.

■ The acts for which appellants were held in contempt occurred at a time after John Hoskins had withdrawn from all participation in Webster Dictionary Company. Also, if Webster Dictionary Company still existed when any of these acts occurred, there is no finding, and it is doubtful that the evidence most favorably viewed would support a finding, that Webster Dictionary Company was in any way involved in these acts. Thus, because no contumacious act of John Hoskins or Webster Dictionary Company has been found, appellants cannot be held on the basis of aiding or abetting them.

A more problematic issue is raised by the relationship between appellants and Thomas Lucas, the other individual named in the injunction. The evidence shows that he served as "legal consultant" to Webster Dictionary Company and served in the same capacity to Webster Publishing. Although named in the injunction, Lucas was not named in the show cause order or the adjudication of contempt. We do not consider whether there may be circumstances in which persons may be held in contempt for aiding and abetting a party who is not also held in contempt. In any event, the order now on appeal cannot be sustained on the theory that appellants aided and abetted Lucas in violation of the injunction. Appellee did not seek to develop the case on this theory, either before the district court or before this court, and the record is thus devoid of essential findings, even if the legal theory should be determined to be valid.

## B.

Was George Hoskins legally identified with one or more of the enjoined parties?

Fed.R.Civ.P. 65(d) provides in pertinent part that an order granting an injunction "is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." It might be argued that, in view of Rule 65(d), only "officers, agents, servants, employees, and attorneys" can now be determined to be within the group that *Alemite* referred to as "legally identified with" a party. Such a narrow reading of Rule 65(d) is inappropriate, however, in light of the fact that this rule is

> derived from the common-law doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in "privity" with them, or subject to their control. Its essence is that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding.

*Regal Knitwear*, 324 U.S. at 14, 65 S.Ct. at 481 (1945).

With respect to persons who may be legally identified with a party as "successors or assigns," the Court added:

> The term "successors and assigns" in an enforcement order of course may not enlarge its scope beyond that defined by the Federal Rules of Civil Procedure. Successors and assigns may, however, be instrumentalities through which defendant seeks to evade an order or may come within the description of persons in active concert or participation with them in the violation of an injunction. If they are, by that fact they are brought within scope of contempt proceedings by the rules of civil procedure...

*Id.* In view of this passage it may be doubted that a "successor" can be within the permissible scope of contempt proceedings absent a finding that the successor was an instrumentality through which *an enjoined party*, and not merely the successor, sought to evade the injunction. We need not consider that question in the present case, just as the Supreme Court found it unnecessary in *Regal Knitwear* to "decide whether or under what circumstances any kind of successor or assign will be liable for violation of a Labor Board order." 324 U.S. at 15, 65 S.Ct. at 481. In any event, if any successor is subject to contempt proceedings *as successor*, rather than as a person "in active concert or participation with" an enjoined party, the successor must be one who has received a *transfer* of the business or some part of it *from the enjoined party*. See *Herrlein v. Kankakis*, 526 F.2d 252, 254–255 (7th Cir. 1975) (transfer of assets from one entity to the other after issuance of injunction was essential to finding the latter liable as a successor in interest). *Cf. Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 177–80, 94 S.Ct. 414, 421–23, 38 L.Ed.2d 388 (1973) (for purposes of Rule 65(d), transferee of business, as "bona fide successor," is in privity with predecessor and is bound by NLRB remedial order directed to predecessor). *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972) is distinguishable. In that case, a new entity, replacing an old entity in a plant security business and hiring a majority of the old entity's employees, was ordered to recognize the union certified to the old entity; the contempt power of the court was not an issue. Counsel have not called our attention to any case, nor have we found any, in which a second business entity was held to be a successor or in privity with an enjoined previously existing business entity, so as to subject the successor to contempt proceedings, in the absence of proof that the second entity acquired the business, or at least a relevant part of it, *from the first entity*. It is not enough to prove that the first entity went out of existence and that the second entity entered into the enjoined type of business activity, knowing about the injunction but without having acquired the business, or a relevant part of it, from the first entity.

In the Findings, Ruling and Order of January 25, 1980, the district court found that appellants were "successors of the original defendant [Webster Dictionary Company] or persons acting in concert with it." We cannot affirm on the basis of this finding, however, because we are unable to determine whether this disjunctively phrased finding was meant to be an unconditional finding of successorship and, if so, whether this mixed determination of fact and law—see *Sweeney v. Board of Trustees of Keene State College*, 604 F.2d 106, 109 n.2 (1st Cir. 1979) *cert. denied*, 444 U.S. 1045, 100 S.Ct. 733, 62 L.Ed.2d 731 (1980) —— may have been affected by an error of law with respect to the requirements for successorship.[8] Even if the evidence before the district court were considered sufficient to support a circumstantial inference of successorship—an issue we do not decide—we cannot determine that the district court made a finding of successorship in the legally relevant sense.[9]

In *Regal Knitwear* the controversy over the permissible scope of contempt proceedings was focused on whether nonparties were legally identified with a party as "successors" or "assigns." We turn now to a materially different issue: Was George Hoskins within the permissible scope of contempt proceedings because he was "legally identified with" Webster Dictionary Company *when the injunction was issued* and for that reason continued to be subject to the injunction even after Webster Dictionary Company went out of existence? This is an issue that was not before the Court in *Regal Knitwear*.

■ Part II of this opinion recites evidence that, though not an officer, director, or shareholder of Webster Dictionary Company, George Hoskins was the next most active person in the operation of the corporation—John Hoskins being the most active. The evidence amply supported the district court's finding that George Hoskins was a "key employee" of Webster Dictionary Company as well as "the principal" of the corporate appellants. This alone, however, is insufficient to support the district court's conclusion that George Hoskins was bound by the injunction. The central reason that one who is not a party to the action in which the injunction was issued cannot be bound by it is that he has not had his day in court *with respect to the validity of the injunction. Cf. Alemite, supra.* Absent an opportunity to contest liability, his knowledge of the injunction is not sufficient to bind him as an individual, *id.*, as distinguished from prohibiting him from acting in the forbidden way on behalf of the enjoined party. Thus, the relevant inquiry is not merely whether (in addition to having knowledge of the injunction) George Hoskins was a "key employee" of Webster Dictionary Company but whether he had such a key role in the corporation's participation in the injunction proceedings that it can be fairly said that he has had his day in court in relation to the validity of the injunction. To meet this requirement, the evidence must go beyond proving merely that George Hoskins was a "key employee" of Webster Dictionary Company. We conclude that it does so.

■ The record before us, with respect to the hearing in January 1976, discloses that those present on behalf of Webster Diction-

---

**8.** For reasons developed in Part IV-A, *ante*, the judgment of the district court cannot be affirmed on the basis that appellants were "acting in concert with" a party.

**9.** If not cured by a showing of George Hoskins' legal identification with Webster Dictionary Company *in some other way* (as may be possible for reasons developed immediately *infra*), this defect is exacerbated in the present case by the fact that the original injunction was issued "by default," under the circumstances discussed on pp. 3–4, *supra. See Gammon,*

*Inc. v. Lemelson*, 442 F.Supp. 211, 214 (D.N.J. 1977) (successor to original defendant through purchase of assets held not bound primarily because injunction entered by default). In the present case the district court expressed doubts about the breadth of the injunction. "It goes pretty far. It may have gone too far." "[T]he injunction—which was actually entered after your withdrawing your appearance in the first case, and there was nobody here to represent the defendant—may [be] too broad, and I may want to modify it . . ."

ary Company included persons holding the positions of "general sales manager of the company, lawyer consultant and general counsel."[10] Although George Hoskins was not identified by name in the record of that hearing, it is undisputed that he is the person who held the position of general sales manager of Webster Dictionary Company at that time. The presence of George Hoskins at these proceedings,[11] together with other circumstantial evidence in the record, would support the inference that George Hoskins participated in Webster Dictionary Company's decisionmaking with respect to its litigation position in the original injunction proceeding.

The fact that George Hoskins was not formally an "officer" of Webster Dictionary Company is not determinative of the question of legal identification with a party in the context of a close corporation operating out of the adjacent apartments of two brothers. The record supports an inference that his responsibilities were substantial, as was his expectation of remuneration if the venture was successful. In his position of "general sales manager," George was a principal actor with respect to the activities that were the occasion for invoking the judicial power of the district court. Advertisements designed, written, and placed by George Hoskins precipitated the injunction, and strikingly similar advertisements, for which he was again responsible, resulted in this contempt proceeding. The businesses were nearly identical—mail order sales of dictionaries and encyclopedias. Thomas Lu-

cas served as "consultant" and "legal advisor" to both corporations. George Hoskins' tenure with Webster Dictionary Company and Webster Publishing overlapped substantially—he started Webster Publishing in mid-1976, but did not leave Webster Dictionary Company until May, 1977 and even thereafter had continuing contacts with Webster Dictionary Company.

In short, a factfinder, weighing the evidence, may find no material difference between George Hoskins' actions as a "key employee" of Webster Dictionary Company and actions in his "individual" capacity as principal of Webster Publishing. The evidence raises a fact issue as to whether this is a case of the same person continuing to do essentially the same thing with the same high degree of practical control, discretion and responsibility, before and after the injunction, with knowledge of the injunction, and after participating in the enjoined firm's corporate decisionmaking regarding its position in the injunction proceedings. If it is found that George Hoskins was legally identified with Webster Dictionary Company in this way, then he is bound by the injunction and the appellant corporations founded by him are also subject to it.

The record before us, however, is not such as to compel a factfinding that George Hoskins was legally identified with Webster Dictionary Company in this way. Evidence of his decisionmaking authority and influence over the corporate policy of Webster Dictionary Company, particularly in relationship to the injunction proceedings, is

10. At the hearing of January 29, 1976 on Merriam's application for a preliminary injunction, in the context of a discussion of the possibility of settling Merriam's claims against Webster Dictionary through the entry of a consent decree, the following colloquy took place:

> THE COURT: What I am thinking about is with a few changes here, I think this thing would be unobjectionable and maybe it's time to have a lobby conference, and let's do that.
>
> Do you think we are at that point? Do you have authority to make representations, or is there somebody here [on behalf of Webster Dictionary]—
>
> MR. McLAUGHLIN: I have the General Sales Manager of the company, lawyer con-

sultant and general counsel, those outside counsel, so I feel I have authority.

> THE COURT: That is a fairly heavy lineup. Let's go into the conference room and see what can be done.

11. If this or other evidence of George Hoskins' participation in the proceedings preceding injunction or of his participation in any other way in corporate policy determinations regarding the injunction proceedings, is to be relied upon at a further hearing on remand, it should be offered in evidence at the further hearing on contempt to avoid any question with respect to whether it may properly be considered as a basis for factfinding in the proceedings on contempt.

sparse. One reason for the paucity of evidence is that George Hoskins, though represented by counsel, did not appear in person at the show-cause hearing and his testimony came in only by a deposition that, by reason of the frequent intervention of his counsel, left many questions unanswered. To the extent that the interrupted questions were objectionable, no adverse inference should be drawn. But, neither party having asked for a ruling by the court on interrupted questions and the deponent being a person cited to show cause and not having appeared in person as a witness at the hearing, if the court concludes that a question was proper and should have been answered, we think it appropriate for the factfinder to take these circumstances into account in assessing the significance of the sparsity of proof.

The deposition testimony of George Hoskins, moreover, could be interpreted as indicating that he believed the injunction applied to him in his activities through Webster Publishing, and that he altered his advertisements to avoid running afoul of it. In answer to the question whether he "violat[ed] any of the terms of the injunction," he answered,

> No, I wouldn't have done it if I thought I was in violation. The word world famous is not that important to me. If I'd have known it was ... if I was that familiar with the injunction I just wouldn't have done it.

Appellants contend strenuously that, on the authority of the "nearly identical" *Alemite* case, George Hokins cannot be bound. In *Alemite*, John Staff, his "agents, employees, associates and confederates" were enjoined from infringing or "aiding and abetting or in any way contributing to the infringement" of a patent. Joseph Staff, who at the time of the injunction was employed by John as a salesman, subsequently left John's employ, set up his own business, and infringed the patent. The court held that Joseph was not bound by the original

injunction where John was not involved in Joseph's infringement.

Although there are definite factual similarities between *Alemite* and the instant case, the two are distinguishable. Joseph Staff was described merely as a "salesman" for his brother's corporation. No participation of Joseph in the planning and direction of the activities causing the original patent infringement is disclosed. In contrast, on the evidence in the record before us, George Hoskins may fairly be found to have been a "managing official," *cf. U. S. v. Miller*, 588 F.2d 1256, 1261–62 (9th Cir. 1978), *cert. denied*, 440 U.S. 947, 99 S.Ct. 1246, 59 L.Ed.2d 24 (1979). Nor is there any indication that the successor firm in *Alemite* was so nearly identical to the original defendant in its business and mode of operation as is the case here, or of any overlap of Joseph Staff's service to the two companies. In short, the facts recited in *Alemite* disclosed none of the factors that, in this case, would support a finding that George Hoskins was legally identified with Webster Dictionary Company when the injunction was issued.

From another perspective, permitting a finding of legal identification of George Hoskins with Webster Dictionary Company, on the record before us, may be viewed as an instance of piercing corporate veils. We are aware of no case either supporting or opposing the application of this concept to the exercise of contempt power in the enforcement of an injunction.[12] There are, of course, precedents for piercing a corporate veil in other contexts. *See, e. g., Zubik v. Zubik*, 384 F.2d 267 (3d Cir. 1967), *cert. denied*, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968); *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 233 N.E.2d 748 (1968). The analogy seems apt, and we conclude that it is appropriate from this perspective also for the present case to turn on a fact finding as to whether George Hoskins was legally identified with Webster Dictionary Company.

---

12. An argument for "disregarding the corporate fiction" in the context of contempt was referred to in *Parker v. United States*, 126 F.2d 370, 378 (1st Cir. 1942), but was rejected because the party advancing the argument had earlier chosen to respect and rely upon the corporate entity.

For the foregoing reasons we conclude that the evidence in the record before us is sufficient to raise a fact question as to whether George Hoskins was legally identified with Webster Dictionary Company in the sense relevant to his having had his day in court on the validity of the injunction. Because we cannot determine that the district court addressed this question and made the necessary findings, applying a legal standard consistent with the views expressed in this opinion, we must remand for further proceedings consistent with this opinion. In such further proceedings, it will be appropriate to afford all parties an opportunity to present further evidence.

■ If, on remand, the district court finds that George Hoskins was legally identified with Webster Dictionary Company in relation to the injunction proceedings, he and the Webster Publishing entities are subject to the injunction. A party and his privies cannot circumvent a court's injunction against the activities they had effectuated before the injunction, through one legal entity, by the creation of another entity through which they, or some of them, continue essentially the same activity. *Cf. U. S. v. Miller*, 588 F.2d at 1261–62; *I.C.C. v. Rio Grande Growers Cooperative*, 564 F.2d 848, 849 (9th Cir. 1977); *Broderick & Bascom Rope Co. v. Manoff*, 41 F.2d 353 (6th Cir. 1930).

### V.

We proceed to consideration of appellants' challenge to the remedy, because that issue is likely to arise again on remand. The remedy ordered by the district court was a $50,000 fine payable to Merriam. Appellants argue this remedy is invalid either as a procedurally defective criminal penalty or as an arbitrary, unproved damage award. Merriam contends that the award may be sustained as a proper exercise of the district court's broad discretion—that it constitutes a "remedial fine," designed both to compensate the plaintiff and to vindicate the court's authority over a recalcitrant litigant. However, Merriam concedes that the district court imposed the

fine without holding the subsequent hearing on damages that the court indicated would be held, and agrees that if this court "should rule that a civil contempt may be remedied only by the amount of a plaintiff's damages caused by violation of the injunction," a remand would be required to determine damages.

■ Contempt proceedings and remedies may be of two types: civil or criminal. The two serve different purposes and require different procedures. Criminal contempt sanctions "are punitive in their nature and are imposed for the purpose of vindicating the authority of the court." *United States v. United Mine Workers*, 330 U.S. 258, 302, 67 S.Ct. 677, 700, 91 L.Ed. 884 (1947), *citing Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 441, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911). Criminal contempt occurs where the actor "defies the public authority and wilfully refuses his obedience." *United Mine Workers, supra*, 330 U.S. at 303, 67 S.Ct. at 701. Prosecutions for criminal contempt require notice "stat[ing] the essential facts constituting the criminal contempt and describ[ing] it as such," and the contemnor is entitled to a hearing and proof beyond a reasonable doubt. Fed.R.Crim.P. 42(b). It is clear from the district court's Order to Show Cause, which referred to "civil contempt," that the proceedings and the remedy here were not designed for criminal contempt. Therefore, the propriety of the fine must be considered in light of the standards applicable to civil contempts.

■ In *United Mine Workers, supra*, the Supreme Court stated:

Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for *either or both* of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained. *Gompers v. Bucks Stove & Range Co., supra*, at 448, 449 [31 S.Ct. at 501]. Where compensation is intended, a fine is imposed, payable to the complainant. Such fine *must of course be based upon*

*evidence of complainant's actual loss,* and his right, as a civil litigant, to the compensatory fine is dependent upon the outcome of the basic controversy. But where the purpose is to make the defendant comply, the court's discretion is otherwise exercised. It must then consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired.

*Id.* at 303–04, 67 S.Ct. at 701 (emphasis added) (citations omitted). Civil contempt sanctions are *not* punitive—*i.e.*, they are not imposed for the purpose of vindicating the court's authority—but are "purely remedial." *Parker v. United States,* 153 F.2d 66, 70 (1st Cir. 1946) ("*Parker II*").

■■■ This court has noted that "[i]t is well settled . . . that the court may, in a proceeding for civil contempt, impose remedial punishment of a fine *payable to an aggrieved litigant as compensation* for the special damages he may have sustained by reason of the contumacious conduct of the offender." *Parker v. United States,* 126 F.2d 370, 380 (1st Cir. 1942) (emphasis added) ("*Parker I*"). However, such a "compensatory fine" must necessarily be limited to the actual damages suffered by the injured party as a result of the violation of the injunction. *Parker II,* 153 F.2d at 71. In contrast to contempt sanctions intended to coerce future compliance,[13] with respect to which a court has wide discretion, the court has little or no discretion with respect to the amount of a fine for contempt sanctions aimed at compensating past noncompliance, except as to awarding costs and attorney's fees.[14] *See Vuitton et Fils v. Carousel Handbags,* 592 F.2d at 130; *Yanish v. Barber,* 232 F.2d 939, 947 (9th Cir. 1956).

■■■ In this case the district court did not articulate its purpose in levying the $50,000 fine against appellants. If this fine was intended to be punitive, it cannot be sustained under the above principles of civil contempt remedies. There is no indication that the fine was intended to coerce future compliance with the injunction. In the more likely event that the fine was intended to be compensatory, it cannot be sustained because it was not linked to any finding of actual damage to Merriam resulting from appellants' violation of the injunction. The limited evidence with respect to Merriam's damages received at the hearing of October 11, 1979 was sketchy and inconclusive, consisting of brief testimony of Merriam's Vice President for Administration and a "Publisher Awareness Study" commissioned by appellants, purporting to show the public's ignorance of the identity of the publishers of various well-known reference books. There was no direct evidence of lost sales by Merriam. The parties and the court appeared to be in agreement that if compensatory damages were to be awarded a further hearing would likely be necessary. Such a hearing may be held if, on

---

**13.** Where the court's purpose is to coerce compliance, the available remedies include imprisonment of the contemnor until he purges himself of contempt by complying with the order, *see Parker I, supra,* 126 F.2d at 379; *Parker II, supra,* 153 F.2d at 70 and a prospective, conditional fine. *See United Mine Workers,* 330 U.S. at 305, 67 S.Ct. at 702; *Hutto v. Finney,* 437 U.S. 678, 690–91, 98 S.Ct. 2565, 2573, 59 L.Ed.2d 83 (1978).

**14.** Merriam contends that in "unusual circumstances" a district court has the discretion to impose a fine for civil contempt which, in addition to the usual purpose of compensating the injured party, serves to "vindicate the District Court's authority over a recalcitrant litigant." *See Hutto v. Finney,* 437 U.S. 678, 691, 98 S.Ct. 2565, 2573, 59 L.Ed.2d 83 (1978) (discussing

analogy of award of attorney's fees for bad faith to a "remedial fine imposed for civil contempt"). We need not determine whether that is so, however. The record discloses no evidence that appellants' violation of the injunction here was so "unusually flagrant" as to justify this extraordinary, hybrid form of relief. By hypothesis, *every* contemnor exhibits contumacious conduct to some extent. Also, the language relied on in *Hutto* is reasonably interpretable as referring to civil contempt penalties intended to coerce compliance rather than to criminal-type penalties. See 437 U.S. at 691–92, 98 S.Ct. at 2573–2574. ("We see no reason to distinguish this award from any other penalty *imposed to enforce a prospective injunction*"); *id.* n. 17 (referring to compensatory nature of civil contempt fines).

remand, the district court finds appellants in contempt.

*Reversed and remanded for further proceedings consistent with this opinion.*