USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT

No. 98-2160

 METRO-GOLDWYN MAYER, INC., DANJAQ, INC.
 AND EON PRODUCTIONS, LTD.,

 Plaintiff-Appellees,

 v.

 007 SAFETY PRODUCTS, INC.,

 Defendant, Appellant.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Nancy Gertner, U.S. District Judge]

 

 Before

 Torruella, Chief Judge,

 Cyr, Senior Circuit Judge,

 and Pollak, Senior District Judge.

 

 Philip X. Murray for appellant.
 Nicholas C. Theodorou, with whom John A. Shope, Sarah Cooleybeck
and Foley, Hoag & Eliot, LLP were on brief for appellees.

 

 July 7, 1999
 
 CYR, Senior Circuit Judge. Defendant 007 Safety
Products, Inc. ("Safety Products") appeals a district court order
which enjoined Safety Products and related parties from violating
a settlement agreement with the alleged owners of the trademarks
"James Bond" and "007." We affirm.
 I
 BACKGROUND
 Safety Products, which manufactured and sold such
products as tear gas and pepper spray, was founded by Ronald
Pasqualino in 1990. Ronald designed product packaging which
included a logo depicting the numerals "007" superimposed on a
spray can ("007 spray can logo"). In 1994, Angelo Pasqualino,
Ronald's brother, became a partner in Safety Products. As Safety
Products was virtually insolvent, Angelo personally invested
$150,000, and incorporated the company, designating himself as
president, and himself and his wife, Patricia, as the only
corporate officers, directors, and shareholders. Patricia took no
part in operating the business, nor did the corporation convene
directors meetings, issue corporate shares, or declare dividends.
 In return for his services, including his solicitation of
business accounts, Ronald received $300 per week. Safety Products
deducted these payments on its tax returns as salary expense. 
Ronald also applied for a trademark on the 007 spray can logo. The
trademark application was actively opposed by plaintiff-appellee
Danjaq, Inc., which itself claimed the trademark for the James Bond
"007" can logo.
 In April 1996, Danjaq, Inc., Metro-Goldwyn-Mayer, Inc.,
Eon Productions, Ltd., and MAC B, Inc. (collectively: "Danjaq")
brought suit in federal district court, claiming that Safety
Products' 007 spray can logo infringed their registered trademarks. 
The district court declined Danjaq's request for preliminary
injunctive relief in July 1996. Rather than take an interlocutory
appeal, Danjaq elected to enter into a settlement agreement with
Safety Products, which prescribed, inter alia, that: (1) Danjaq
pay Safety Products $150,000; (2) Safety Products be permitted to
continue to use "007" in its corporate name, but be prohibited from
using "007," "James Bond," or the associated logos in its product
packaging or advertising; (3) Safety Products file or "ensure
that Ronald Pasqualino, and or . . . any other appropriate person
. . . . . . file the appropriate documents necessary to abandon"
the pending trademark application for the 007 spray can logo; and
(4) the parties "take all reasonable steps . . . to persuade the
district court to vacate [its July 1996 order denying Danjaq a
preliminary injunction]" and refrain from interim release and
publication of its July 1996 order. Ronald Pasqualino was not
mentioned in the Agreement, which was executed by Angelo as
president of Safety Products.
 Danjaq promptly remitted the $150,000 to Safety Products,
which wired $50,000 to a bank account controlled by Ronald,
designating it in the company books as "Ronnie's share" of the
settlement proceeds. On June 23, 1997, Ronald withdrew his
trademark application. The district court in turn vacated its
earlier July 1996 order denying preliminary injunctive relief to
Danjaq.
 On August 13, 1997, Danjaq informed the court of the
settlement. The court conditionally dismissed the case, subject to
its reopening in the event the settlement was not consummated
within sixty days. Five weeks later, however, Ronald filed an
application with the United States Patent and Trademark Office
("Trademark Office") to reinstate his trademark application. In
addition, he threatened to publish the vacated July 1996 order on
the Internet unless Danjaq paid him money over and above the
$150,000 already paid to Safety Products.
 On October 9, 1997, Danjaq moved to set aside the
conditional dismissal entered by the district court on August 13,
and to enforce the Settlement Agreement. Meanwhile, the Trademark
Office denied the pending application to reinstate the trademark
application withdrawn by Ronald Pasqualino on June 23.
 At the district court hearing on Danjaq's motion to set
aside the conditional dismissal entered on August 13, Danjaq
contended that Ronald though neither a named party nor a
signatory to the Settlement Agreement was so "legally identified"
with Safety Products as to have become contractually bound as its
agent, see Fed. R. Civ. P. 65(d); infra Section II.C. Following
extensive discovery on this issue, the district court permanently
enjoined Safety Products, and others in active concert with it
(including Ronald Pasqualino), from further attempts to reinstate
the withdrawn trademark application or to publish the vacated July
1996 order on the Internet. In due course, Safety Products
appealed.
 II
 DISCUSSION
 A. Subject Matter Jurisdiction

 Safety Products first contends that the district court
lacked subject matter jurisdiction to enter final judgment and
issue the injunction. It relies on the principle that federal
district courts normally lack either the authority to impose a
subsequent condition on a dismissal entered with prejudice based on
a stipulation of dismissal with prejudice pursuant to Fed. R. Civ.
P. 41(a)(1)(ii) ("[A]n action may be dismissed by the plaintiff
without order of court . . . by filing a stipulation of dismissal
signed by all parties who have appeared in the action."), or the
jurisdiction to reopen a dismissed case to enforce a settlement. 
See Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 378
(1994); cf. Fed. R. Civ. P. 41(a)(2) (providing that, "[e]xcept as
provided in [Rule 41(a)(1)], an action shall not be dismissed at
the plaintiff's instance save upon order of the court and upon such
terms and conditions as the court deems proper"). Even though
Danjaq and Safety Products filed no such stipulation of dismissal
with prejudice, Safety Products contends that the district court
nonetheless lost jurisdiction because Danjaq breached its
settlement agreement by failing to file the stipulation. See supra
Section I. We do not agree.
 First, Kokkonen terminates jurisdiction only after the
Rule 41(a)(1)(ii) stipulation has been filed. Thus, Danjaq's
failure to file the required stipulation is dispositive. 
 Second, the Court also explained in Kokkonen that even
after the parties file a Rule 41(a)(1)(ii) stipulation the district
court retains the power to enforce the settlement agreement
provided the dismissal order expressly incorporates the settlement
agreement, or expressly preserves jurisdiction over the settlement
agreement. See Kokkonen, 511 U.S. at 381-82 ("Even when, as
occurred here, the dismissal is pursuant to Rule 41(a)(1)(ii)
(which does not by its terms empower a district court to attach
conditions to the parties' stipulation of dismissal) we think the
court is authorized to embody the settlement contract in its
dismissal order (or, what has the same effect, retain jurisdiction
over the settlement contract) if the parties agree."); Pratt v.
Philbrook, 109 F.3d 18, 21 n.5 (1st Cir. 1997). 
 The Settlement Agreement in the instant case clearly did
not preclude retention of jurisdiction by the district court. Cf.
Hester Indus., Inc. v. Tyson Foods, Inc., 160 F.3d 911, 913, 916
(2d Cir. 1998) (finding no jurisdiction where settlement agreement
prohibited entry of any judgment or injunction against either
party). Quite the contrary, the dismissal order entered by the
district court expressly retained jurisdiction over the settlement
agreement for sixty days, and Safety Products neither objected nor
insisted on its right to an unconditional Rule 41(a)(1)(ii)
dismissal. Cf. Gardiner v. A.H. Robins Co., 747 F.2d 1180, 1189-90
(8th Cir. 1984) (finding no jurisdiction where parties to
stipulated dismissal neither knew about or agreed to retention of
jurisdiction).
 B. Scope of Injunction
 Safety Products next contends that the district court
abused its discretion by enjoining Safety Products from further
efforts to reinstate its withdrawn trademark application and from
threatening to publish the vacated July 1996 preliminary injunction
order on the Internet. See A.W. Chesterton Co. v. Chesterton, 128
F.3d 1, 5 (1st Cir. 1997) (appellate court reviews grants of
permanent injunctive relief for abuse of discretion); see also
Fed. R. Civ. P. 65.
 1. Trademark Abandonment
 The district court determined that Safety Products
violated the settlement agreement provision requiring it to abandon
the 007 spray can trademark application. See Agreement 4(g). It
held that "[a] withdrawal followed by a 'withdrawal of a
withdrawal' is obviously not [an] effective abandonment." Safety
Products responds that it did not breach the settlement agreement
since the Trademark Office determined that its attempt to withdraw
the abandonment was ineffectual.
 Danjaq counters that the reinstatement application filed
by Safety Products remained pending before the Trademark Office at
the time Danjaq filed its motion to enforce the settlement, and,
therefore, Danjaq was entitled to prospective injunctive relief. 
Be that as it may, by the time the district court permanently
enjoined Safety Products, the Trademark Office had ruled that
Safety Products could not withdraw its June 23 abandonment.
 Normally, courts may not enjoin conduct if "(1) it can be
said with assurance that 'there is no reasonable expectation . .
.' that the alleged violation will recur, and (2) interim relief or
events have completely and irrevocably eradicated the effects of
the alleged violation." County of Los Angeles v. Davis, 440 U.S.
625, 631 (1979) (citations omitted). Danjaq argues, however, that
since Ronald Pasqualino had on one occasion filed a motion for
reconsideration of the Trademark Office's decision to deny his
reinstatement application, "there is no indication that he would
have stopped requesting 'reconsideration' in the absence of the
District Court's injunction." 
 "The burden of demonstrating mootness is a 'heavy one,'" 
id. (citation omitted), and it fell to Safety Products to
demonstrate that its past attempts to reinstate the trademark
application likely would not recur. Safety Products, which filed
no reply brief on appeal, has not attempted to meet its burden. 
That is, it does not contend let alone attempt to prove that
Trademark Office procedures precluded it from filing either
successive motions to reconsider or successive motions to set aside
its June 1997 abandonment on grounds not raised previously. Given
Ronald Pasqualino's prior conduct, we cannot conclude that Danjaq's 
concerns about being brought before the Trademark Office again
absent injunctive relief were unfounded.
 2. Preliminary Injunction Order
 Safety Products next contends that the Settlement
Agreement did not prevent it from disseminating the July 1996
preliminary injunction over the Internet, but instead mandated only
that it join with Danjaq in persuading the district court to vacate
the July 1996 order, and refrain from publishing the order "in any
official reporter or in any other medium, including but not limited
to the LEXIS and Westlaw electronic databases." See Agreement 4(c)
(emphasis added). Since it cooperated in getting the district court
to vacate the order and halt its interim publication, Safety
Products argues that Ronald Pasqualino's dissemination of the
vacated order on the Internet would not have breached the literal
terms of the Settlement Agreement.
 Safety Products' interpretation of the Settlement
Agreement strikes us as high octane sophistry. First, although 
4(c) literally addresses only the district court's publication of
the vacated order, as a whole 4(c) evinces a reasonable
expectation on the part of Danjaq that Safety Products was to take
good faith measures to ensure that the order was not published in
any of the enumerated media. Second, in 16, Safety Products
agreed that "the Terms of this Agreement (including, but not limited
to, the matters enumerated in paragraph 4 above), shall remain
confidential, and shall not be disclosed to any person or entity.
. . . In the event any person should inquire of any of the parties
concerning the action or products' claims, the party of whom the
inquiry is made may say that the matter has been fully and finally
resolved, but shall not say any more." Thus, the confidentiality
clause expressly precluded not only disclosure of the terms in 4,
but any "matters" enumerated in 4, thereby plainly encompassing
the text of the vacated order. Contracts include an implied
covenant that all parties shall perform their contractual
obligations in good faith. See James L. Miniter Ins. Agency, Inc.
v. Ohio Indemnity Co., 112 F.3d 1240, 1249 (1st Cir. 1997). Safety
Products reasonably cannot claim that its only obligation was to
persuade the district court not to publish the vacated order on the
Internet, but that Safety Products itself remained free to do so. 
 C. "Legal Identification"
 Federal Rule of Civil Procedure 65(d) provides that an
order granting an injunction "is binding only upon the parties to
the action, their officers, agents, servants, employees, and
attorneys, and upon those persons in active concert or participation
with them who receive actual notice of the order by personal service
or otherwise." See G. & C. Merriam Co. v. Webster Dictionary Co.,
639 F.2d 29, 36 (1st Cir. 1980) ("'[D]efendants may not nullify a
decree by carrying out prohibited acts through aiders and abettors,
although they were not parties to the original proceeding.'")
(citation omitted). Safety Products argues that the district court
erred in finding that Ronald Pasqualino was "legally identified"
with Safety Products, and therefore personally bound by the
settlement agreement.
 The "legal identification" test focuses on whether Ronald
Pasqualino's participation in Safety Products was sufficiently
significant to make him a de facto participant in the Settlement
Agreement. See id. at 37-38. Safety Products acknowledges that the
factual finding of "legal identification" may not be disturbed
unless clearly erroneous. See id. at 38. There is ample record
support.
 Ronald co-founded Safety Products. Safety Products'
attorney referred to Ronald as its co-"owner." Ronald designed the
007 spray can logo, and applied for the trademark. See id.
("Advertisements designed, written, and placed by [the legally
identified person] precipitated the injunction."). During the
period from 1994-97, Ronald received more than $10,000 in
compensation for services performed for Safety Products, which
amount was deducted by Safety Products on its tax returns as a
business expense. Angelo Pasqualino consulted Ronald during the
settlement negotiations with Danjaq, and sent him copies of the
Agreement and related documents for review. See Project B.A.S.I.C.
v. Kemp, 947 F.2d 11, 20 (1st Cir. 1991) (noting that Merriam test
is satisfied where the legally identified person "enjoyed
substantial control . . . decisionmaking with respect to
[defendant's] litigation position"). Safety Products paid Ronald
$50,000 ("Ronnie's share") from the $150,000 it received from Danjaq
under the Settlement Agreement. See id. ("The record supports an
inference that [the legally identified person's] responsibilities
were substantial, as was his expectation of remuneration if the
venture was successful.").
 Safety Products neither contends that the district court
findings lack record support nor that the above-cited evidence is
immaterial to the "legal identification" inquiry. Rather, it
catalogs snippets of evidence which might conceivably support a
contrary finding. Since the district court was the factfinder,
however, and none of the catalogued evidence conclusively
established that Ronald was not "legally identified" with Safety
Products, we will not disturb its factual finding. Ramos v. Davis
& Geck, Inc., 167 F.3d 727, 733 (1st Cir. 1999) ("'[W]here there are
two permissible views of the evidence, the factfinder's choice
between them cannot be clearly erroneous.'") (citation omitted).
 Affirmed; costs to appellees.