DYSTAR CORPORATION and Bayer Corporation, Plaintiffs,

v.

Wilfred M. CANTO, Patricia A. Canto, Thomas S. Cannito, Armand LeMire, Robert W. Mullen, Sun East, Inc., Suneast Chemical Corporation, Colonial Color Company Limited and Quality Technical Service Corporation, Defendants,

v.

COMPASS BANK FOR SAVINGS and Merrill Lynch, Trustee Process Defendants.

No. Civ.A. 96–11720–PBS.

United States District Court, D. Massachusetts.

Aug. 7, 1997.

50

Brian A. Davis, Jonathan Chiel, Keith E. Wexelblatt, Choate, Hall & Stewart, Boston, MA, for Plaintiffs.

Normand G. Benoit, Michael A. Gamboli, Partridge, Snow & Hahn, Providence, RI, for Wilfred M. Canto, defendant.

Alan D. Rose, Rose & Associates, Boston, MA, Alan D. Rose, Jr., Rose & Associates, Boston, MA, for Patricia A. Canto, defendant.

Paul J. Murphy, Theodore D. Lustig, Joseph H. Walsh, Menard, Murphy & Walsh, Boston, MA, Frederic F. Azrak, Peter V. Mcarthur, Azrak Associates, Pompton Plains, NJ, for Thomas S. Cannito, defendant.

Kevin E. Sharkey, Kenna, Johnston & Sharkey, Manchester, NH, for Armand Lemire, defendant.

SARIS, District Judge.

Court adopts R & R of M.J. Bowler re: Motion C#63 for Contempt.

## REPORT AND RECOMMENDATION RE: PLAINTIFFS' MOTION FOR CIVIL CONTEMPT AGAINST DEFENDANTS ROBERT W. MULLEN AND QUALITY TECHNICAL SERVICES CORP. AND QTS, INC. (DOCKET ENTRY # 63)

BOWLER, United States Magistrate Judge.

Plaintiffs Dystar Corporation ("Dystar") and Bayer Corporation ("Bayer") (collectively: "plaintiffs") request that this court enter an order finding defendant Quality Technical Service Corporation ("Quality Tech"), defendant Robert Mullen ("Mullen"), President of Quality Tech, and nonparty QTS, Inc. ("QTS"), in contempt for violating an August 9, 1996 Preliminary Injunction Order. (Docket Entry # 63). In addition to a finding of civil contempt, plaintiffs seek an order requiring QTS and Mullen to return to Quality Tech all assets transferred from Quality Tech during the pendency of this litigation. Plaintiffs further request that all assets and profits of QTS be held in trust for plaintiffs and that Mullen and QTS provide plaintiffs with an accounting of such assets and profits.

Plaintiffs also seek appointment of a receiver to oversee Quality Tech and reimbursement of costs and attorney's fees.

Quality Tech, Mullen and QTS oppose the motion. (Docket Entrye68–70). On May 21, 1997, this court held a hearing and took the motion (Docket Entry # 63) under advisement. Notwithstanding the opportunity (Docket Entry # 80), none of the parties chose to present live testimony at the hearing.

## BACKGROUND

On August 5, 1996, plaintiffs filed suit in Massachusetts Superior Court claiming that former employees, defendants Wilfred M. Canto ("Canto") and Thomas S. Cannito ("Cannito"), with the assistance of Mullen, Quality Tech and other defendants, engaged in a fraudulent scheme to divert profits and sales from plaintiffs to Quality Tech, Canto and other defendants.

On August 9, 1996, the state court trial judge entered the Preliminary Injunction Order ("the PI Order") which prohibits Mullen and Quality Tech from disposing or transferring their assets except in the normal course of business. The PI Order reads as follows:

> Defendants Patricia A. Canto, Thomas S. Cannito, Armand Lemire, Robert Mullen and Quality Technical Service Corp. be preliminarily enjoined from encumbering, transferring, concealing, wasting or otherwise disposing of their assets, other than in the normal course of business, during the pendency of this action.

(Docket Entry # 63, Ex. A).[1]

Plaintiffs maintain, in part, that Mullen, Quality Tech and QTS violated the PI Order by transferring Quality Tech assets to QTS and hiring former Quality Tech employees to work at QTS. The facts, taken from the verified complaint, excerpts of depositions, Mullen's affidavit and supporting documents

attached to the relevant pleadings, evidence the following.

In 1995 Bayer merged its dyestuff operations with Hoechst Celanese Corporation ("Hoechst") and formed Dystar, L.P., a manufacturer and marketer of textile dyes and related chemicals. Dystar is the general partner and Bayer is a limited partner of Dystar, L.P. In 1989 Canto and Cannito worked at Bayer and/or its corporate predecessors in various sales capacities. (Docket Entry # 6).

In late 1989 Canto approached Mullen and suggested that Mullen form a nonexclusive Bayer distributorship in the Northeast and make Canto and Cannito silent partners.[2] In December 1989 Mullen incorporated Quality Tech in Rhode Island. (Docket Entry # 6).

Quality Tech's Articles of Incorporation describe its purpose as, "Sales of dyes and chemicals to industry." The verified complaint confirms that Quality Tech was engaged in the business of distributing and selling dyes and chemicals to the textile industry at the wholesale level. Quality Tech was also one of at least two nonexclusive distributors of plaintiffs' textile dye and chemical products in the Northeast and had a distributorship agreement with Dystar, L.P.[3] (Docket Entry # 6; Docket Entry # 70).

By letter dated September 25, 1996, Dystar, L.P. wrote to Mullen and terminated its distributorship agreement with Quality Tech. The letter additionally rescinded any license Quality Tech had to use the Dystar name. By letter dated September 25, 1996, Bayer similarly terminated Quality Tech's "at-will distributorship" to use the Bayer name. Ninety percent of Quality Tech's business in September 1996 consisted of selling products under the Dystar distributorship agreement. (Docket Entry # 70).

In October 1996 Mullen formed a new business, QTS. Like Quality Tech's Articles of Incorporation, QTS' Articles of Incorpo-

---

**1.** Thereafter, this case was removed to this court. As provided for under 28 U.S.C. § 1450, "All injunctions, orders, and other proceedings had in [a removed] action prior to its removal shall remain in full force and effect until dissolved or modified by the district court."

**2.** Plaintiffs allege that this clandestine arrangement violated Bayer's conflict of interest policy.

**3.** Plaintiffs assert that Canto and Cannito used their positions at Bayer and their subsequent employment positions at Dystar to increase the profitability of Quality Tech at plaintiffs' expense.

ration describe its purpose as, "sales of dyes and chemicals to industry." (Docket Entry # 63, Ex. B; Docket Entry # 70).

As a result of the September 25, 1996 letters, Quality Tech could no longer maintain its existing business of selling plaintiffs' products. Mullen further testified that he could not make a living as President of Quality Tech due to Dystar's termination of the distributorship agreement. Accordingly, he began "winding up" Quality Tech's business. (Docket Entry # 63, Ex. B; Docket Entry # 68, Ex. A; Docket Entry # 70).

As of October 15, 1996, Mullen estimated that Quality Tech's inventory was worth $250,000. Thereafter, Quality Tech returned a portion of this inventory to Dystar and sold a portion to Quality Tech customers.[4] Quality Tech then sold the portion of the inventory which remained as of December 31, 1996, to QTS. Mullen also advised Quality Tech's customers that Quality Tech would cease active business operations as of December 31, 1996. QTS paid Quality Tech between $6,000 to $7,000 for the aforementioned remaining inventory. (Docket Entry # 68, Ex. A).

Morlot & Chemical Company, Inc. ("Morlot"), which was also interested in purchasing the remaining inventory, made a written offer to purchase the remaining inventory for $6,600.[5] Frank DeCeglie of Morlot stated his belief at the time that the fair market value of the remaining inventory was $6,600. Mullen, President of both Quality Tech and QTS, refused the Morlot offer and, as noted above, sold the remaining inventory to QTS. Quality Tech deposited the proceeds in its bank account. (Docket Entry # 68, Ex. A; Docket Entry # 70).

In or around January 1997 Mullen began operating QTS. When asked to describe the business operations of QTS and Quality Tech at his deposition, Mullen replied that both companies sold dyes and chemicals. Quality Tech's and QTS' products were not, however, identical. For example, QTS does not carry the leather fixers and certain direct dyes previously carried by Quality Tech. On the other hand, Quality Tech sold acids and dispersed dyes which QTS presently sells. QTS has a distribution agreement with Clarion, a manufacturer of dyes and chemicals. Lila Mullen, Mullen's wife, is the Secretary and Treasurer of QTS as well as its sole shareholder. Mullen, President of QTS, and Lila Mullen are the only two directors of the company. (Docket Entry # 63, Ex. B; Docket Entry # 68, Ex. A; Docket Entry # 70).

In addition to purchasing the remaining inventory of Quality Tech, QTS bought all of Quality Tech's office equipment, except for one office computer. The office equipment consisted of desks, tables, chairs, a copier, two computers, and office furniture. In 1995 the office equipment was worth $22,502.35. Less depreciation, however, Mullen testified that the net worth of the equipment as of December 31, 1995, was $400. Quality Tech did not dispose of any office equipment in 1996 prior to selling the equipment to QTS. In or around October or November 1996, Office Concepts, Inc. appraised the office equipment and valued it at $3,000. Near the end of 1996, Quality Tech sold the remaining office equipment, except for the computer, to QTS for $3,300. Quality Tech deposited the $3,300 proceeds into its bank account. With the possible exception of the computer, Mullen did not know of any other assets that Quality Tech had as of February 21, 1997. (Docket Entry # 68, Ex. A; Docket Entry # 63, Ex. B; Docket Entry # 70).

Two of Quality Tech's former employees and one shared employee presently work for QTS. In particular, during the three years preceding February 1997 Quality Tech employed Patrick Pagliuco ("Pagliuco"), Tom Innes ("Innes"), Karen Fonseca ("Fonseca"), Robert Namen ("Namen"), Hans Shofflin ("Shofflin"), Tom Madeiros ("Madeiros") and Kristen Mullen as well as Mullen. Pagliuco and Innes, former salesmen at Quality Tech, voluntarily resigned from Quality Tech in September and October 1996. In October or November 1996 Mullen terminated Fonseca's

---

4. Mullen could not remember the amount of money Quality Tech received for the portion of the inventory sold to Quality Tech customers. (Docket Entry # 68, Ex. A).

5. Morlot made the offer by letter dated January 28, 1997, addressed to Mullen at QTS' address.

employment as a secretary at Quality Tech. Similarly, in December 1996 Mullen terminated Namen's employment in shipping and receiving at Quality Tech and Shofflin's employment as a salesman at Quality Tech. Madeiros resigned from Quality Tech in 1995. (Docket Entry # 68, Ex. A; Docket Entry # 63, Ex. B).

Kristen Mullen, Mullen's daughter, continues to be employed at Quality Tech but also works as a secretary for QTS. She receives two separate paychecks. On January 1, 1997, Shofflin began working as a salesman at QTS and Namen began working in shipping and receiving at QTS. Shofflin, Namen and Kristen Mullen all work in the same space and at the same desks that they formerly occupied at Quality Tech.[6] (Docket Entry # 68, Ex. A; Docket Entry # 63, Ex. B). In other words, excluding Mullen, two of Quality Tech's former seven employees now work at QTS and one of Quality Tech's employees presently works for both Quality Tech and QTS. Thus, more than 50% of QTS' workforce consists of present or former Quality Tech employees.

Quality Tech and QTS also share office space at 63 Commercial Way in East Providence, Rhode Island. In May 1996 Quality Tech entered into a five year lease for office and warehouse space at 63 Commercial Way. Although Quality Tech occupies a small portion of this space due to the cessation of its business activities, it remains obligated under the lease and paid an estimated $3,100 in rent in February 1997. QTS occupies approximately 15% of the office space at 63 Commercial Way and pays Quality Tech a proportionate amount in rent. QTS also makes payments on two automobile leases which remain under Quality Tech's name. (Docket Entry # 68, Ex. A; Docket Entry # 63, Ex. B; Docket Entry # 70).

Finally, eleven customers of QTS are, in fact, former customers of Quality Tech. QTS acquired these customers by soliciting their business via a letter of introduction. Mullen, however, first sent letters to Quality Tech customers informing them about the terminated distributorship agreements and the existence of the remaining inventory of plain-tiffs' products. Thereafter, QTS sent the customers a letter introducing QTS as a new company. The letter pledged to give these customers the same excellent service they had received from Quality Tech. (Docket Entry # 63, Ex. B; Docket Entry # 70).

## DISCUSSION

■ In order to establish civil contempt, plaintiffs must prove noncompliance with the PI Order by clear and convincing evidence. *Langton v. Johnston*, 928 F.2d 1206, 1220 (1st Cir.1991) ("a complainant must prove civil contempt by clear and convincing evidence"); *Equal Employment Opportunity Commission v. Local 638*, 81 F.3d 1162, 1171 (2d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 333, 136 L.Ed.2d 246 (1996) ("proof of non-compliance is 'clear and convincing'"); *Devine v. State of Rhode Island*, 827 F.Supp. 852, 863 (D.R.I.1993) ("'complainant must show by clear and convincing evidence that a specific order of the Court has been violated'"). In addition, "the underlying order must be clear and unambiguous in its terms." *Gemco Latinoamerica, Inc. v. Seiko Time Corporation*, 61 F.3d 94, 98 (1st Cir.1995). Ambiguities and uncertainties about the scope of a court order are read in favor of "the person charged with contempt." *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 16 & 18 (1st Cir.1991).

■ Turning to the latter requirement, the order must "be specific about what is to be done or avoided" and "who was expected to behave in the indicated fashion." *Project B.A.S.I.C. v. Kemp*, 947 F.2d at 17. Furthermore, the contemnor must be able to "'ascertain from the four corners of the order precisely what acts are forbidden.'" *King v. Allied Vision, Limited*, 65 F.3d 1051, 1058 (2d Cir.1995).

As shown in the four corners of the PI Order, it expressly applied to Mullen and Quality Tech. QTS, however, was a nonparty and thus may be held in civil contempt only under certain limited circumstances described *infra*.

---

**6.** QTS also employs Angel Beltran as a salesman.

■ The PI Order also specifically identified the prohibited acts of Mullen and Quality Tech, i.e., "encumbering, transferring, concealing, wasting or otherwise disposing of their assets, other than in the normal course of business." Such language is sufficiently specific to give Mullen and Quality Tech fair notice of the nature of the prohibited acts. Moreover, neither Quality Tech nor Mullen challenge the clarity or the sufficiency of the PI Order. Instead, they contend that they preserved as opposed to wasted Quality Tech's assets.

Turning to the former requirement, plaintiffs met their burden of establishing that Mullen and Quality Tech violated the PI Order in certain respects. The PI Order expressly prohibited Mullen and Quality Tech from transferring their assets except in the normal course of business. Quality Tech's normal course of business is distributing and selling dyes and chemicals to the textile industry. It is not selling office equipment or the entirety of its remaining inventory. The conduct of Quality Tech and Mullen, as its President, in selling Quality Tech's office equipment and the inventory remaining as of December 31, 1996, to QTS violated the clear and unambiguous terms of the PI Order. The fact that Quality Tech received moneys for the sales may diminish plaintiffs' actual damages but it does not detract from the fact that Mullen and Quality Tech transferred assets other than in the normal course of business.

Mullen and Quality Tech nevertheless insist that they took steps to preserve Quality Tech's assets and to mitigate Quality Tech's losses caused by the September 25, 1996 letters terminating the distributorships. They submit that plaintiffs' termination of the distributorships effectively put Quality Tech out of business. This argument, however, focuses on the language in the PI Order prohibiting Mullen and Quality Tech from "wasting" their assets and ignores the language prohibiting Mullen and Quality Tech from "transferring" their assets "other than in the normal course of business."

7. As previously noted, the stated business purpose in QTS' Articles of Incorporation is striking-

■ Furthermore, "good faith is not a defense to civil contempt." *Fortin v. Commissioner of the Massachusetts Department of Public Welfare*, 692 F.2d 790, 796 (1st Cir.1982). Although it is true that a party may defend its failure to comply with a court order on the basis that compliance is impossible, "self-induced inability ... does not meet the test." *In re Power Recovery Systems, Inc.*, 950 F.2d 798, 803 (1st Cir.1991). The burden of proving impossibility falls on Mullen and Quality Tech and "that burden is difficult to meet." *Fortin v. Commissioner of the Massachusetts Department of Public Welfare*, 692 F.2d at 796.

Mullen and Quality Tech do not meet this burden. Plaintiffs' terminations of Quality Tech's distributorships did not make it impossible for Quality Tech to comply with the PI Order. Nor did the terminations force Mullen to cease Quality Tech's business operations. Quality Tech's Articles of Incorporation do not restrict its business to distributing plaintiffs' products. As amply demonstrated by QTS,[7] Quality Tech could have developed other avenues of business in the selling and distributing of dyes and chemicals to the textile industry. Indeed, former Quality Tech employees, now working at QTS, developed such avenues of business with former Quality Tech customers.

In sum, the transfer of Quality Tech's office equipment and remaining inventory to QTS violated the PI Order. Mullen and Quality Tech fail to show it was impossible to comply with the PI Order and are therefore in contempt of the PI Order.

■ Plaintiffs' remaining arguments concerning additional "transfers" in violation of the PI Order are unavailing. For example, plaintiffs assert that Quality Tech's "transfer" of the majority of its employees to QTS violated the PI Order. Such conduct, however, does not contravene the clear and unambiguous terms of the PI Order. The PI Order prohibited the transfer of "assets." It is not clear that employees are assets of a corporation. Further, an employee who resigns or is terminated is not necessarily

ly similar to the stated business purpose in Quality Tech's Articles of Incorporation.

"transferred" to another corporation.[8] An order must leave "no reasonable doubt as to what behavior was expected," *Project B.A.S.I.C. v. Kemp,* 947 F.2d at 17, and extending the PI Order to encompass the "transfer" of employees under the present circumstances is problematic. Uncertainties about the scope of the PI Order are resolved in favor of Mullen and Quality Tech. Accordingly, plaintiffs fail to meet their burden of establishing by clear and convincing evidence that Mullen's termination of Shofflin and Namen and their subsequent employment at QTS as well as Kristen Mullen's employment at QTS violated the PI Order.

■ Plaintiffs also complain about Quality Tech's decision to rent its offices to QTS "for a small fraction of the rent due under the existing lease." Quality Tech submits that, "Such transfers do not constitute the 'normal course' of business." (Docket Entry # 63, p. 5). First, Quality Tech's obligation under the terms of a five year lease is more reasonably characterized as a liability or debt rather than an asset. Second, receipt of rent is not the transfer of an asset within the meaning of the PI Order. Plaintiffs therefore fail to establish that QTS' rental of office space contravenes the clear and unambiguous terms of the PI Order.

■ Plaintiffs also point to Quality Tech's "transfer of at least eleven (11) of its existing customers to QTS." (Docket Entry # 63, p. 5). Again, such conduct does not fall within the clear and unambiguous terms of the PI Order. Plaintiffs failed to demonstrate by clear and convincing evidence that Quality Tech transferred an asset to QTS. There was little, if any, evidence that Quality Tech had a proprietary customer list which it then transferred to QTS. Rather, plaintiffs only demonstrated that Quality Tech and QTS have a number of the same customers and that Mullen actively solicited these customers to do business with QTS.

■ In addition to finding Quality Tech and Mullen in contempt, plaintiffs seek a court order finding QTS, a nonparty, in contempt of the PI Order. Ordinarily, an injunction is binding only on the parties named in the order. Thus, "a court 'cannot lawfully enjoin the world at large.' "*People by Vacco v. Operation Rescue National,* 80 F.3d 64, 70 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 85, 136 L.Ed.2d 42 (1996) (quoting *Alemite Manufacturing Corporation v. Staff,* 42 F.2d 832, 832 (2d Cir.1930)). " '[T]he only occasion when a person not a party may be punished, is when he has helped to bring about ... what [the decree] has the power to forbid, the act of the party. This means that the respondent must either abet the defendant, or must be legally identified with him.' " *G.&C. Merriam Company v. Webster Dictionary Company, Inc.,* 639 F.2d 29, 35 (1st Cir.1980) (quoting *Alemite Manufacturing Corporation v. Staff,* 42 F.2d at 832–833).

Rule 65(d), Fed.R.Civ.P. ("Rule 65(d)"), essentially codifies the common law rules set forth in *Alemite. Additive Controls & Measurement Systems, Inc. v. Flowdata, Inc.,* 96 F.3d 1390, 1395 (Fed.Cir.1996). The rule provides, in pertinent part, that, "Every order granting an injunction and every restraining order ... is binding ... upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." Fed.R.Civ.P. 65(d). Plaintiffs submit that QTS was in "active concert or participation" with the contumacious conduct of Quality Tech and/or Mullen.

■ Courts generally interpret "the language 'active concert or participation with' as requiring that a person either be legally identified with a party in the case or aid and abet the party to violate the decree." *Project B.A.S.I.C. v. Kemp,* 947 F.2d at 20 (internal brackets, quotation marks and citation omitted). As stated in *Merriam,* "To hold a nonparty bound by an injunction it is thus essential to prove either that the nonparty participated in the contumacious act of a party or that the nonparty was subject to the injunction because legally identified with a party." *Merriam Company v. Webster Dictionary Company, Inc.,* 639 F.2d at 35; *see*

---

**8.** As discussed in the factual background, Mullen terminated Shofflin's and Namen's employment at Quality Tech in December 1996. On January 1, 1997, Shofflin and Namen began working at QTS. Kristen Mullen works at both Quality Tech and QTS.

also *Gemco Latinoamerica, Inc. v. Seiko Time Corporation,* 61 F.3d at 98 (nonparty "may be held in civil contempt if it knowingly aids or abets a party in violating the court order").

■ The evidence that QTS aided and abetted Quality Tech's and Mullen's violation of the PI Order is overwhelming. Mullen, as President of both QTS and Quality Tech, actively participated in the transfer of Quality Tech's remaining inventory and office equipment to QTS. The conduct of Mullen, as President of QTS, was instrumental in achieving the transfers and his actions proved successful. QTS therefore actively and successfully worked to acquire Quality Tech's assets and thereby violate the PI Order. *See, e.g., Gemco Latinoamerica, Inc. v. Seiko Time Corporation,* 61 F.3d at 99 (bank, which orchestrated flow of monies in violation of attachment order, aided and abetted the parties in violating the order); *see generally Select Creations, Inc. v. Paliafito America, Inc.,* 852 F.Supp. 740, 779 (E.D.Wis. 1994) (defining aiding and abetting for purposes of Rule 65(d) as nonparty associating with venture, participating in venture and seeking "by his action to make it succeed"). Accordingly, provided that QTS had notice of the PI Order as discussed below, it is in contempt of the PI Order.

Alternatively, QTS is also legally identified with Quality Tech and Mullen. *See generally Merriam Company v. Webster Dictionary Company, Inc.,* 639 F.2d at 37–40 (discussing legal identification). After issuance of the PI Order, Mullen, together with his wife, created a corporation which had the same stated business purpose as Quality Tech, i.e., to sell dyes and chemicals to industry. Although QTS has a number of different products, the majority of its employees are current or former Quality Tech employees. Both Quality Tech and QTS are small, closely held corporations operated by the same individual, Mullen. QTS occupies the same office space as Quality Tech and uses Quality Tech's former office equipment. Eleven customers of QTS are former customers of Quality Tech. The businesses are strikingly similar in nature even accounting for Quality Tech's operation as a distributor for plaintiffs. Plaintiffs therefore met their burden of establishing that QTS was legally identified with Quality Tech and/or Mullen.

■ In addition to establishing by clear and convincing evidence that QTS either participated in the contumacious acts of Quality Tech and Mullen or is legally identified with Quality Tech or Mullen, plaintiffs must establish that QTS had actual knowledge of the PI Order. Rule 65(d) requires that the nonparty "receive actual notice of the order." Fed. R.Civ.P. 65(d); *see also Reich v. United States,* 239 F.2d 134, 137–138 (1st Cir.1956), *cert. denied,* 352 U.S. 1004, 77 S.Ct. 563, 1 L.Ed.2d 549 (1957). Formal service of the order on the nonparty, however, is not necessary to establish notice. Rather, "[k]nowledge of the order suffices." *United States v. Baker,* 641 F.2d 1311, 1317 (9th Cir.1981).

■ In the case at bar, plaintiffs established that QTS had notice of the PI Order. At his February 21, 1997 deposition, Mullen, then President of QTS, stated that he had seen the PI Order before (Docket Entry # 63, Ex. B). *See, e.g., In re Public Service Company of New Hampshire,* 848 F.Supp. 318, 327 (D.R.I.1994), *aff'm'd,* 43 F.3d 763 (1st Cir.1995), *cert. denied,* 514 U.S. 1108, 115 S.Ct. 1959, 131 L.Ed.2d 850 (1995) (nonparty admitted he had read injunction at his deposition and therefore had notice of the order). Mullen was also a party to the PI Order. Circumstantial evidence therefore supports his knowledge of the PI Order at the time he became President of QTS. QTS, acting through Mullen, its President, therefore had notice of the PI Order within the meaning of Rule 65(d), Fed.R.Civ.P.

■ In sum, plaintiffs established by clear and convincing evidence that QTS was "in active concert or participation" with Quality Tech and/or Mullen. It is worth recognizing, however, that QTS' relationship to Quality Tech and Mullen therefore permits a finding of contempt on the part of QTS but it does not allow this court to subject QTS to the terms of the PI Order itself. "Having a relationship to an enjoined party of the sort set forth in Rule 65(d) exposes a non-party to contempt for assisting the party to violate the injunction, but does not justify granting

injective relief against the non-party in its separate capacity." *Additive Controls & Measurement Systems, Inc. v. Flowdata, Inc.,* 96 F.3d 1390, 1395–1396 (Fed.Cir.1996).

The remaining issue is therefore what, if any, sanction to impose on Mullen, Quality Tech and QTS for being in contempt of the PI Order. Sanctions in civil contempt are permitted for two purposes: (1) to coerce the defendant into compliance with the court's order; and (2) to compensate the complainant for losses sustained as a result of the contumacious behavior. *United States v. United Mine Workers,* 330 U.S. 258, 303–304, 67 S.Ct. 677, 91 L.Ed. 884 (1947) (citing *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 448–49, 31 S.Ct. 492, 55 L.Ed. 797 (1911)); *Merriam Company v. Webster Dictionary Company, Inc.,* 639 F.2d at 40–41 (quoting *United States v. United Mine Workers,* 330 U.S. at 303–304). The former remedy is inappropriate. Quality Tech has few, if any, remaining assets. The likelihood of future transfers of Quality Tech assets in violation of the PI Order is therefore remote. Inasmuch as the transfers are complete, Quality Tech, Mullen and QTS are not continuing to violate the PI Order. Sanctions are therefore limited to compensating plaintiffs for past transgressions.

Compensatory sanctions are "limited to the actual damages suffered by the injured party as a result of the violation of the injunction." *Merriam Company v. Webster Dictionary Company, Inc.,* 639 F.2d at 41; *United States v. United Mine Workers,* 330 U.S. at 304 (compensable fine must "be based upon evidence of complainant's actual loss"); *see also Gemco Latinoamerica, Inc. v. Seiko Time Corporation,* 61 F.3d at 100 (implicit in damage calculation was that each payment "was also a violation of the court's attachment order"). The party seeking such damages "must show that he has

suffered damage as a result of the violation." *Burke v. Guiney,* 700 F.2d 767, 770 (1st Cir.1983). Once the complainant shows such damages, he "is entitled as of right to an order in civil contempt imposing a compensatory fine." *Parker v. United States,* 153 F.2d 66, 70 (1st Cir.1946); *accord AMF Incorporated v. Jewett,* 711 F.2d 1096, 1101 (1st Cir.1983) (quoting *Parker*). Furthermore, "The court has no discretion to withhold the appropriate remedial order." *Parker v. United States,* 153 F.2d at 70.

The record demonstrates, however, that Quality Tech received adequate remuneration for the value of the transferred assets. Quality Tech deposited the proceeds from the transfers of the office equipment and the remaining inventory in its bank account. Plaintiffs do not adequately address Quality Tech's argument (Docket Entry # 68, n. 5) that they suffered no actual damages. In fact, plaintiffs simply enumerate their requested relief without providing any legal or factual support to award such relief. This court therefore finds that plaintiffs suffered no actual damages as a result of the prohibited transfers.

Plaintiffs also seek reimbursement · from Mullen and Quality Tech of attorney's fees and costs due to Mullen's and Quality Tech's failure to abide by the terms of the PI Order. This court has greater discretion in awarding attorney's fees and costs than in awarding a fine to compensate for past noncompliance with a court order. *Merriam Company v. Webster Dictionary Company, Inc.,* 639 F.2d at 41 (citing *Vuitton et Fils v. Carousel Handbags,* 592 F.2d 126, 130 (2d Cir.1979)).

The issue of whether the contemnor's conduct must have been wilful in order for the complainant to recover attorney's fees is one of first impression in the First Circuit.[9] With the exception of the Second Circuit,[10] the majority of circuits reaching this

---

9. In citing *Vuitton,* however, the First Circuit in *Merriam* may have indicated its endorsement of a requirement of wilfulness. *See Vuitton et Fils v. Carousel Handbags,* 592 F.2d at 130 (appropriate "to award the reasonable costs of prosecuting the contempt, including attorney's fees, if the violation of the decree is found to have been wilful"). On the other hand, in *N.L.R.B. v. Maine Caterers, Inc.,* 732 F.2d 689 (1st Cir.1984),

the First Circuit upheld the recommendations of a special master adjudging the respondents in civil contempt and ordered reimbursement of costs, including attorney's fees, without an express finding of wilful conduct.

10. Although decisions in the Second Circuit generally require a showing of wilfulness, the decisions are not entirely uniform. *Cf. Weitzman v.*

issue do not require a finding of wilfulness.[11] *See, e.g., Robin Woods Inc. v. Woods,* 28 F.3d 396, 400 (3rd Cir.1994) (rejecting "notion that a finding of wilfulness is a prerequisite to an award of attorney's fees against the violator of an injunction"); *Sizzler Family Steak Houses v. Western Sizzlin Steak,* 793 F.2d 1529, 1535–1536 (11th Cir.1986) (upholding attorney's fee award notwithstanding absence of wilfulness and recognizing that reimbursement "may include 'expenses reasonably and necessarily incurred in the attempt to enforce compliance' "); *Perry v. O'Donnell,* 759 F.2d 702, 705 (9th Cir.1985) (noting that "inflexible rule" requiring wilfulness "would prevent the party proving the contempt from being fully compensated"); *TWM Manufacturing Company, Inc. v. Dura Corporation,* 722 F.2d 1261, 1273 (6th Cir.1983) (dicta that wilfulness is not an element of civil contempt and that award of attorney's fees and expenses "may be appropriate in a civil contempt proceeding"); *Cook v. Ochsner Foundation Hospital,* 559 F.2d 270, 272 (5th Cir.1977) (court has inherent authority to award attorney's fees for violation of court order irrespective of whether the disobedience was wilful). As viewed by the Fifth Circuit in *Cook,* attorney's fees are part of the damages incurred by the complainant in bringing the contempt to the attention of the court. *Cook v. Ochsner Foundation Hospital,* 559 F.2d at 272.

It is, however, unnecessary to decide whether conduct falling short of wilfulness will support an attorney's fee award in this case because there is ample evidence of the wilfulness of Mullen and Quality Tech.

"[W]ilfulness generally connotes intentional action taken with at least callous indifference for the consequences." *Sizzler Family Steak Houses v. Western Sizzlin Steak,* 793 F.2d at 1535. For example, wilfulness may exist where the contemnor had the capacity to comply with the order, failed to act in good faith and did not move to modify the order prior to engaging in the contumacious acts. *King v. Allied Vision, Limited,* 919 F.Supp. 747, 752–753 (S.D.N.Y.1996) (setting forth various definitions of wilfulness).

In the case at bar, the PI Order is short and straightforward. It left no room for doubt that the conduct of transferring assets of Quality Tech was prohibited. *See, e.g., Engine Specialties, Inc. v. Bombardier Limited,* 605 F.2d 1, 20 (1st Cir.1979), *cert. denied,* 449 U.S. 890, 101 S.Ct. 248, 66 L.Ed.2d 116 (1980) (upholding attorney's fee award by lower court which found wilful conduct and noting that "district court made clear that the injunction extended to spare parts" but the defendant continued to sell them). Mullen's excuse that plaintiffs terminated the distributorships and forced him to cease operations at Quality Tech does not excuse either Mullen's or Quality Tech's noncompliance.[12] *See, e.g., Cabrera v. Municipality of Bayamon,* 622 F.2d 4, 7 (1st Cir.1980) (affirming attorney's fee award while noting that the defendant Mayor of Bayamon's reason for noncompliance, i.e., that local statutes fixed the city's budget, "cannot excuse noncompliance with the court's order"). Similarly, Mullen's averment that he mitigated Quality Tech's losses by allowing QTS to purchase the remaining inventory and office

---

*Stein,* 98 F.3d 717, 719 (2d Cir.1996) (dicta that "while wilfulness may not necessarily be a prerequisite to an award of fees and costs, a finding of wilfulness strongly supports granting them"); *with King v. Allied Vision Limited,* 65 F.3d 1051, 1063 (2d Cir.1995) (to award fees "district court had to find that New Line's contempt was wilful"). "The D.C. Circuit has not squarely ruled on whether bad faith is a prerequisite to a grant of attorneys' fees in a contempt action." *Food Lion, Inc. v. United Food & Commercial Workers Intern. Union,* 103 F.3d 1007, 1017 n. 14 (D.C.Cir.1997).

**11.** " 'In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorney's fee from the loser.' " *In re DN Associ-*

*ates,* 165 B.R. 344, 348 (Bkrtcy.D.Me.1994) (quoting *Alyeska Pipeline Company v. Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)). Exceptions to the American Rule exist. One such exception "is that 'a court may assess attorney's fees for the wilful disobedience of a court order.' " *United States v. Dinwiddie,* 885 F.Supp. 1299, 1306 (W.D.Mo. 1995) (quoting *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)).

**12.** Mullen attests, in part, that due to Dystar's termination of the distributorship, the normal course of Quality Tech's business "includes the winding up of Quality's ongoing business." (Docket Entry # 70).

equipment is disingenuous and does not detract from Mullen's and Quality Tech's violations of the express terms of the PI Order prohibiting the transfer of Quality Tech assets. Furthermore, Mullen unquestionably knew about the PI Order yet failed to seek modification of it prior to the transfers. Such conduct on the part of both Mullen individually and as President of Quality Tech was wilful.

Plaintiffs are therefore entitled to an award of reasonable attorney's fees and costs incurred as a result of the contumacious conduct of Mullen and Quality Tech. *See, e.g., Inversiones Financieras C. Por A. v. Hitachi Sales Caribe, Inc.,* 337 F.Supp. 54, 57 (D.P.R. 1971) (finding that the defendants wilfully disobeyed court order and awarding plaintiffs reasonable attorney's fees albeit no actual damages). Stated otherwise, Mullen and Quality Tech's wilful violation of the PI Order justifies an award of attorney's fees and costs reasonably incurred in bringing the contempt to the attention of this court. *See Chambers v. NASCO, Inc.,* 501 U.S. 32, 45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *Parker v. United States,* 153 F.2d at 70 (fine in civil contempt proceeding may not exceed complainant's actual loss "plus complainant's reasonable expenses in the proceedings necessitated in presenting the contempt for the judgment of the court"). Quality Tech and Mullen are therefore ordered to reimburse plaintiffs for the reasonable attorney's fees which they incurred as a result of the contumacious conduct and for the reasonable expenses they incurred in bringing the contempt to the attention of this court.[13]

### CONCLUSION

In sum, this court **RECOMMENDS**[14] that plaintiffs' motion for civil contempt (Docket Entry # 63) be **ALLOWED** in part and **DENIED** in part. To the extent described in the body of this opinion, this court further **RECOMMENDS**[15] that Mullen, Quality Tech and QTS be found in civil contempt of the PI Order and that Mullen and Quality Tech be **ORDERED** to pay plaintiffs reasonable attorney's fees and costs.

**13.** The parties may attempt to agree by stipulation on reasonable attorney's fees and costs. Absent such an agreement, plaintiffs should submit, by motion, evidentiary support for their attorney's fees and costs within 30 days of the date of this Order. Plaintiffs, Mullen and/or Quality Tech may also request an evidentiary hearing and/or a hearing for the purpose of presenting argument.

**14.** Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report and Recommendation to which objection is made and the basis for such objection. Any party may respond to another party's objections within ten days after service of the objections. Failure to file objections within the specified time waives the right to appeal the district court's order. *United States v. Escoboza Vega,* 678 F.2d 376, 378–79 (1st Cir.1982); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986).

**15.** See the previous footnote.