**FEDERAL TRADE COMMISSION,**
**Plaintiff,**

v.

**PRODUCTIVE MARKETING,**
**INC., et al., Defendants.**

**No. CV 00–6502.**

United States District Court,
C.D. California.

Feb. 22, 2001.

Debra A Valentine, Kenneth H Abbe, Los Angeles, CA, Randall H Brook, Mary T Benfield, Nadine S Samter, Kathryn C Decker, Seattle, WA, for plaintiff.

Steve Cochran, Laurence G Solov, Katten Muchin & Zavis, Los Angeles, CA, for Matthew B Hyman, Zachary A. Hyman, Joshua Hyman.

Matthew B. Hyman, Santa Barbara, CA, pro se.

Zachary A. Hyman, Santa Barbara, CA, pro se.

Joshua Hyman, Santa Barbara, CA, pro se.

John R Heisner, S Todd Neal, Sullivan Hill Lewin Rez & Engel, San Diego, CA, for American Credit Card Processing Corp.

## MEMORANDUM DECISION IN SUPPORT OF ORDER GRANTING PLAINTIFF'S MOTION FOR CONTEMPT

MANELLA, District Judge.

### I. INTRODUCTION

On June 19, 2000, the Federal Trade Commission ("FTC") initiated this action

against defendants Productive Marketing ("Productive"), Foreclosure Solutions dba Formula Solutions ("Foreclosure"), and their principals, Matthew Hyman, Zachary Hyman, and Joshua Hyman (collectively, "Defendants"). The FTC's Complaint charged Defendants with violating Section 5(a) of the Federal Trade Commission Act ("FTC Act"), which prohibits "[u]nfair methods of competition ... and unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1); Compl. ¶¶ 24–38. Citing Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), the government sought a preliminary injunction, permanent injunction, rescission, restitution, disgorgement, and appointment of a receiver. *See* Compl., at 10–11 (Prayer for Relief).

Concurrent with its Complaint, the FTC submitted an *ex parte* application for a temporary restraining order ("TRO"), asset freeze, appointment of a temporary receiver, immediate access to PMI's business premises, limited expedited discovery, restitution, and disgorgement of profits. *See* TRO Brief, at 2. Pursuant to its authority under Fed.R.Civ.P. 65(b) and Section 13(b) of the FTC Act, the court granted the TRO on June 19, 2000 and issued an Order to Show Cause why a preliminary injunction should not follow. *See* June 19, 2000 Order Granting *Ex Parte* Application. After a hearing on the Order to Show Cause, the court issued a preliminary injunction based on the terms of the TRO. June 28, 2000 Preliminary Injunction Order. On December 21, 2000, the FTC moved for an order finding nonparty American Credit Card Processing Corporation ("ACCPC") in contempt for failure to comply with the court's Preliminary Injunction Order. On January 17, 2001, the court approved a stipulated order for a permanent injunction as to all Defendants. That order provided for consumer redress and other forms of equitable relief.

## II. RELEVANT FACTUAL BACKGROUND [1]

Defendants advertised and sold booklets containing information on public auctions of seized vehicles and foreclosed homes. To facilitate credit card sales of their products, Defendants contracted with ACCPC, an independent sales organization headquartered in New York that is in the business of brokering agreements between credit card processors and merchants for the purposes of facilitating consumer credit card transactions. In exchange for its services, ACCPC received a commission equal to 2.95% of the value of each credit card transaction. This commission was deducted from the proceeds of each transaction.

ACCPC, in turn, contracted with Equifax Payment Services ("Equifax") to process credit card transactions for the Productive and Foreclosure accounts. In addition to ACCPC's commission, Equifax withheld a "reserve" equal to ten percent of the credit card charges processed to cover chargebacks by merchants or refund requests by consumers, and forwarded that amount to ACCPC. Equifax then deposited the remainder in the bank accounts of Productive and Foreclosure. Equifax deducted its fee from the total funds paid to ACCPC at the end of each month.

The court's TRO placed Productive and Foreclosure in receivership. On the FTC's recommendation, the court appointed Susan Montgomery as Receiver. The court extended the receivership in its Preliminary Injunction Order. Section VII of the court's Preliminary Injunction Order required any person holding assets or documents of the receivership defendants to turn those assets or documents over to the Receiver. Pl.'s Ex. 1, at 24. Section VIII

---

1. Unless otherwise noted, the following facts are undisputed.

required "all banks, broker-dealers, savings and loans, escrow agents, title companies, commodity trading companies, or other financial institutions [to] cooperate with all reasonable requests [of the Receiver] relating to the implementation of this Order, including transferring funds at [her] direction and producing records related to the assets of the receivership defendants." Pl.'s Ex. 1, at 25–26.

The Receiver sent Marty Oser of ACCPC a copy of the court's Preliminary Injunction Order July 7, 2000 and requested any documents relating to Productive and Foreclosure in ACCPC's possession, a statement of reserves held in the Productive and Foreclosure accounts, and the amount of current chargebacks. Pl.'s Ex. 5, at 104. The initial documentation ACCPC provided to the Receiver revealed several discrepancies. Pl.'s Ex. 5, at 112 ("Based on our review of the numbers provided to date, it appears that [ACCPC has] understated the reserve by at least $8,384 and, either [ACCPC] or Equifax has failed to pay to Formula Solutions an additional $125,043.80.").[2] On August 23, 2000, the Receiver demanded "a complete accounting for the period January 1, 2000 through July 31, 2000 that reflects *all* amounts that were paid to [ACCPC] or that [ACCPC] received from Equifax or Formula/Foreclosure . . . ." Pl.'s Ex. 5, at 118. The Receiver eventually contacted Equifax to obtain the information necessary to perform her own accounting. *Id.* (letter from the Receiver informing Oser

that "Equifax is now investigating the unaccounted funds and will respond to me directly"); Pl.'s Ex. 7, at 122; Pl.'s Ex. 9, at 158. ACCPC finally faxed an accounting to the Receiver November 21, 2000. Pl.'s Ex. 11.[3]

Pursuant to the asset freeze authorized by the court in its Preliminary Injunction Order of June 28, 2000, the Receiver closed the Productive and Foreclosure bank accounts. As a result, some Equifax wire transfers intended for those accounts were redirected to ACCPC. Carlson Decl. ¶ 5 ("[T]he amounts were paid to ACCPC because Productive and Foreclosure's bank accounts rejected Equifax's deposits.").[4] In a letter dated September 29, 2000, the Receiver brought these misdirected deposits to ACCPC's attention, and demanded that ACCPC immediately transfer the funds to the receivership estate. Pl.'s Ex. 9, at 192.[5] In a letter dated October 20, 2000, counsel for ACCPC promised: "To the extent that the audit and accounting discloses that ACCPC holds any money belonging to the Receivership Entities, it will tender it promptly." Pl.'s Ex. 10, at 240. To date, none of these misdirected funds have been delivered to the Receiver.

The Receiver opened new accounts for Productive and Foreclosure for the purpose of accepting consumer chargebacks. To fund those chargebacks, ACCPC made four $10,000 deposits to those accounts. ACCPC claims that it requested an ac-

2. As noted above, Formula Solutions is a "dba" for Foreclosure.

3. The Receiver immediately notified ACCPC that the "accounting" failed to reflect misdirected deposits and reserves valued in excess of $94,000, and failed to substantiate items ACCPC had deducted from the reserves. Pl.'s Ex. 12.

4. The court will refer to these funds as "misdirected deposits."

5. In her September 29 letter, the Receiver identified $106,175.95 in Foreclosure funds and $76,711.23 in Productive funds that had been redirected to ACCPC's account. Pl.'s Ex. 9, at 192. ACCPC's November 21 accounting also showed $76,711.23 in "unlocated" Equifax deposits to Productive's merchant account. Pl.'s Ex. 11, at 248.

counting of the chargebacks paid by the receivership when it made those payments. ACCPC Ex. 3 (letter dated November 13, 2000 reminding the Receiver that "you promised an accounting of the $40,000 that has been sent to you from ACCPC."); Cousins Decl. ¶ 9 ("Through my representation of ACCPC, I have been informed that on several occasions Mr. Oser asked the Receiver to provide an accounting of which charge-backs were paid by the receivership."). In response to this request, the Receiver furnished ACCPC's counsel with copies of merchant bank account statements for the receivership defendants reflecting the ACCPC deposits and corresponding Equifax withdrawals. Supp. Montgomery Decl. ¶ 3c.[6] It is undisputed that "all of the funds that were released by ACCPC have been used to pay chargebacks or fees deducted by Equifax," and the records of such chargebacks are available to ACCPC through Equifax. *Id.*

### III. DISCUSSION

#### A. *Personal Jurisdiction*

Although ACCPC does not expressly challenge the court's jurisdiction in its opposition to the instant motion, neither does it "waive or concede jurisdiction." Opp., at 2. The FTC counters that there is ample basis for the court's exercise of personal jurisdiction over ACCPC. Reply, at 2–3. Because ACCPC appears to contest jurisdiction, the court addresses the issue below.

 Due process considerations require that the party over whom jurisdiction is asserted possess certain minimum contacts with the forum state, "so that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice." *International Shoe v. Washing-*

*ton,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). There are two types of jurisdiction: general and specific jurisdiction. Only the latter is at issue here.

 Specific jurisdiction allows a court to hear a cause of action that arises out of a party's activities in or with the forum. A court may exercise specific jurisdiction over a party if the following conditions are satisfied: (1) the party has completed some transaction in the forum or with an in-state resident, or "perform[ed] some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws"; (2) the claim arises out of the party's forum-related activities; and (3) the exercise of jurisdiction is reasonable. *Brainerd v. Governors of the Univ. of Alberta,* 873 F.2d 1257, 1259 (9th Cir.1989); *accord Peterson v. Highland Music, Inc.,* 140 F.3d 1313, 1320 (9th Cir.1998), *cert. denied,* 525 U.S. 983, 119 S.Ct. 446, 142 L.Ed.2d 401 (1998). Once the plaintiff has established the first two elements, "a rebuttable presumption arises that the exercise of jurisdiction is reasonable" and the burden of proving otherwise rests with the party contesting jurisdiction. *Sinatra v. National Enquirer,* 854 F.2d 1191, 1195 (9th Cir.1988).

 Here, the requirements for jurisdiction have been met. ACCPC entered into a contract to process consumer credit card charges for Productive and Foreclosure, two California corporations. *See* Pl.'s Ex. 14 (Merchant Processing Agreement between Foreclosure and ACCPC). By executing this agreement, enforceable in California, ACCPC purposefully availed itself of the protections of California law. *Cf. Peterson,* 140 F.3d at 1320 (defendants'

---

**6.** Equifax apparently handled chargebacks and refund requests on behalf of the receiver-

ship.

licensing agreements with California companies gave rise to purposeful contacts sufficient to establish specific jurisdiction).

Furthermore, according to Gordon Lincoln, the systems manager for Foreclosure, "California residents made up the single largest group of cardholders [whose credit card transactions ACCPC processed for Foreclosure]." Lincoln Decl. ¶ 4. Specifically, 5,614 of the 16,042 Foreclosure credit card transactions that generated a fee for ACCPC were initiated by California residents. *Id.* Because ACCPC completed thousands of transactions involving California residents, from which it derived considerable financial benefit, the first prong of the Ninth Circuit's three-prong test for personal jurisdiction is satisfied.

■ Turning to the second prong, the instant matter clearly relates to ACCPC's forum-related activities. The FTC seeks an order compelling ACCPC to turn over to the Receiver any assets or documents connected to Defendants in ACCPC's possession. But for ACCPC's agreement to process credit card transactions for the receivership defendants and its deduction of reserves from consumer credit card charges to fund chargebacks, ACCPC would not be holding any assets of receivership estate, and the FTC would have no reason to move for a contempt order.

■ Because the first two elements of the Ninth Circuit test for specific jurisdiction have been established, the court's ex-

ercise of specific jurisdiction over ACCPC is presumptively reasonable. ACCPC has offered no evidence to rebut this presumption. Accordingly, the court determines that ACCPC has sufficient contacts with the forum state to support the court's assertion of personal jurisdiction over ACCPC for purposes of this motion.[7]

## B. *Enforcement of Preliminary Injunction Against ACCPC*

As a threshold matter, the court must determine whether its Preliminary Injunction Order can be enforced against ACCPC. ACCPC argues that it is not bound by the court's Order. In support of its position, ACCPC notes that it is neither a party to the action, nor was it named in the court's Preliminary Injunction Order. Opp., at 9–10. *But see Waffenschmidt v. MacKay,* 763 F.2d 711, 717 (5th Cir.1985) ("An injunction binds not only the parties subject thereto, but also nonparties who act with the enjoined party.").

■ The federal rules "provide for enforcement of judgments against non-parties in limited circumstances." *Peterson v. Highland Music, Inc.,* 140 F.3d 1313, 1323 (9th Cir.1998). Under Fed.R.Civ.P. 65(d), an injunction is binding upon "the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise."[8] Ordinarily, a nonparty "must ei-

**7.** Even if the court did not have *in personam* jurisdiction over ACCPC, it could nonetheless exercise *in rem* jurisdiction over the receivership assets in ACCPC's possession. Here, the court's Preliminary Injunction Order includes assets of the receivership defendants only, and it is undisputed that those defendants have minimum contacts with the forum and have been afforded an opportunity to be heard. January 17, 2001 Stipulated Order for Permanent Injunction, at 3. Because the Order does not extend to any property to which ACCPC has title, ACCPC's contacts with the

forum state are irrelevant for purposes of *in rem* jurisdiction. *Cf. In re San Vicente Medical Partners Ltd.,* 962 F.2d 1402, 1408 (9th Cir.1992) (district court may include property in a receivership order as long as the *owner* of such property has minimum contacts with the forum state and receives actual notice and an opportunity to be heard).

**8.** Fed.R.Civ.P. 71 provides that "when obedience to an order may be lawfully enforced against a person who is not a party, that person is liable to the same process for en-

ther abet defendant [in violating the court's order] or be legally identified with him," and have notice of the order to be found in contempt. *Peterson,* 140 F.3d at 1323 (quoting *NLRB v. Sequoia District Council of Carpenters,* 568 F.2d 628, 633 (9th Cir.1977)).

■ Courts have interpreted this language to require that the nonparty have "knowingly aid[ed] or abet[ted] a party in violating the court order." *Gemco Latinoamerica, Inc. v. Seiko Time Corp.,* 61 F.3d 94, 98 (1st Cir.1995); *accord Additive Controls & Measurement Systems, Inc. v. Flowdata, Inc.,* 96 F.3d 1390, 1395 (Fed. Cir.1996) ("[T]hose who act in concert with the enjoined party may be held in contempt, but only for assisting the enjoined party in violating the injunction."). ACCPC does not dispute that it received actual notice of the court's Preliminary Injunction Order, but argues that there is no evidence to suggest that ACCPC acted in concert or participation with Defendants to violate the Order. Opp., at 10; ACCPC's Supp. Brief, at 3. The FTC counters that ACCPC served as Defendants' agent for purposes of processing consumer credit transactions, and thus acted in concert with Defendants for purposes of Fed. R.Civ.P. 65(d).

■ "An injunction issued against a corporation or association binds the agents of that organization to the extent they are acting on behalf of that organization." *People v. Operation Rescue,* 80 F.3d 64, 70 (2d Cir.1996). "Having a relationship to an enjoined party of the sort set forth in Rule 65(d) exposes a non-party to contempt for assisting the party to violate the injunction, but does not justify granting injunctive relief against the non-party in its separate capacity." *Additive Controls,*

96 F.3d at 1395–96; *accord Saga International, Inc. v. John D. Brush & Co., Inc.,* 984 F.Supp. 1283, 1286 (C.D.Cal.1997) (Rule 65(d) "merely codified the common law practice of refusing to let a party violate an injunction through intermediaries."). Accordingly, the agency relationship alleged by the FTC, without more, does not support a finding of contempt against ACCPC, a nonparty. *Cf. G. & C. Merriam Co. v. Webster Dictionary Co., Inc.,* 639 F.2d 29, 35 (1st Cir.1980) ("Proof of a relationship to the pre-injunction act of a party may be circumstantially suggestive, but a nonparty, if not legally identified with a party, can be found to be in contempt only if in active concert or participation with a party in postinjunction activity.").

■ The FTC further asserts that the court's power to enjoin ACCPC "is derived from its inherent authority to fashion effective relief," and that such power is broader than the authority conferred by Rule 65(d). FTC Supp. Brief, at 2–3. That federal courts possess broad authority "to issue a variety of 'ancillary relief' measures in [enforcement] actions brought by [federal agencies]" cannot be gainsaid. *SEC v. Wencke,* 622 F.2d 1363, 1369 (9th Cir.1980); *see also SEC v. Universal Financial,* 760 F.2d 1034, 1038 (9th Cir.1985) (District court's power to enter a blanket receivership stay "is broader than the court's authority to grant or deny injunctive relief under Fed.R.Civ.P. 65."). "The Supreme Court has repeatedly emphasized the broad equitable powers of the federal courts to shape equitable remedies to the necessities of particular cases, especially where a federal agency seeks enforcement

forcing obedience to the order as if a party." "Rule 71 was intended to assure that process be made available against persons who are properly affected by them, even if they are not

parties to the action." *Westlake North Property Owners Ass'n v. Thousand Oaks,* 915 F.2d 1301, 1304 (9th Cir.1990)

in the public interest." *Wencke,* 622 F.2d at 1371.

One expression of the court's inherent authority to fashion equitable relief is the *in rem* injunction. In *United States v. Hall,* 472 F.2d 261 (5th Cir.1972), Judge Wisdom observed: "Federal courts have issued injunctions binding on all persons, regardless of notice, who come into contact with property which is the subject of a judicial decree." *Id.* at 265–66 (citations omitted).[9] Because "in rem orders [are] particularly vulnerable to disruption by an undefinable class of persons who are neither parties nor acting at the instigation of parties . . . . courts must have the power to issue orders . . . tailored to the exigencies of the situation and directed to protecting the court's judgment." *Id.* at 266; *accord United States v. Paccione,* 964 F.2d 1269, 1275 (2d Cir.1992) (Orders issued "to preserve property for forfeiture following a RICO conviction . . . closely resemble remedies such as garnishment or attachment, which may be directed routinely at third-parties, who have no interest in the merits of the underlying litigation.").

■ An order issued to preserve the assets of a receivership estate is a classic example of an *in rem* injunction. *Cf. Wencke,* 622 F.2d at 1369 (the district court's power "to issue a stay, effective against all persons, of all proceedings against the receivership entities rests as much on its control over the property placed in receivership as on its jurisdiction over the parties to the . . . action.").

Upon imposition of a receivership, all property in the possession of the debtor passes into the custody of the receivership court, and becomes subject to its authority and control. In the exercise of its jurisdiction over the debtor's property, the court has power to issue injunctions and all other writs necessary to protect the estate from interference and to ensure its orderly administration. *Eller Indus., Inc. v. Indian Motorcycle Mfg., Inc.,* 929 F.Supp. 369, 372 (D.Colo. 1995); *see also Lankenau v. Coggeshall & Hicks,* 350 F.2d 61, 63 (2d Cir.1965) ("There is substantial jurisdictional basis for allowing the federal court receiver to have and keep custody and control of the assets in question, and to obtain the relief needed to implement that custody."); *SEC v. Hardy,* 803 F.2d 1034, 1037 (9th Cir. 1986) ("The basis for broad deference to the district court's supervisory role in equity receiverships arises out of the fact that most receiverships involve multiple parties and complex transactions."); *Paccione,* 964 F.2d at 1275 (affirming criminal contempt sanctions against "a person who interfered with the *res,* the disposition of which the court had specifically restricted").

■ In *SEC v. Wencke,* 622 F.2d 1363 (9th Cir.1980), an SEC enforcement action, the court enforced a blanket stay of actions against an equitable receivership and its assets, declaring that "rule 65(d) does not limit the power of a federal court to enter such orders." *Id.* at 1371. The court noted, however, that such orders would be upheld only "upon an appropriate showing of necessity." *Id.* The *Wencke* court found that a blanket stay was "necessary to achieve the purposes of the receivership." *Id.* at 1369. Here, the receivership was instituted to preserve the assets of Productive and Foreclosure in

---

9. "Literally read, Rule 65(d) would forbid the issuance of in rem injunctions." *United States v. Hall,* 472 F.2d 261, 267 (5th Cir. 1972). However, because Rule 65(d) merely codified the common law, it does not limit "the inherent power of a court to protect its ability to render a binding judgment." *Id.* As a result, "courts have continued to issue in rem injunctions notwithstanding Rule 65(d), since they possessed the power to do so at common law." *Id.* (collecting cases).

order to provide redress for defrauded consumers.[10] Permitting ACCPC to retain assets that are properly part of the receivership estate would thus thwart the purpose of the receivership. Moreover, requiring the FTC to institute a separate action against any third party holding assets of the receivership estate "would result in a multiplicity of actions in different forums, and would increase litigation costs for all parties while diminishing the size of the receivership estate." *SEC v. Universal Financial,* 760 F.2d 1034, 1038 (9th Cir.1985). Accordingly, a preliminary injunction directing any entity holding assets of the receivership defendants to turn those assets over to the Receiver is necessary to achieve the purposes of the receivership.

In *United States v. Hall,* 472 F.2d 261 (5th Cir.1972), the court upheld criminal contempt sanctions imposed against a nonparty who violated a desegregation decree, citing the court's inherent authority "to protect its ability to render a binding judgment between the original parties." *Id.* at 268; *accord United States v. Paccione,* 964 F.2d 1269, 1274–75 (2d Cir.1992) ("A court may bind non-parties to the terms of an injunction or restraining order to preserve its ability to render a judgment in a case over which it has jurisdiction."). ACCPC suggests that *Hall* applies only to civil rights cases. ACCPC's Supp. Brief, at 3. However, the *Hall* court did not confine its holding to such matters. Rather, Judge Wisdom specifically relied on cases involving *in rem* injunctions to support his conclusion that courts have inherent authority to enforce their orders against nonparties. Moreover, courts have applied the principle announced in *Hall* outside the civil rights context. *See Paccione,* 964 F.2d at

1275 (affirming criminal contempt conviction against nonparty to RICO prosecution).

ACCPC further contends that *Hall* permits courts to enjoin nonparties only in "extraordinary cases." ACCPC's Supp. Brief, at 3. As the Federal Circuit recently acknowledged, the *Hall* exception applies where "the activities of third parties threaten to undermine the court's ability to render a binding judgment in the case before it." *Additive Controls,* 96 F.3d at 1395; *see also Hall,* 472 F.2d at 265 ("the conduct of [third parties], if unrestrained, could have upset the court's ability to bind the parties [before it]."); *Paccione,* 964 F.2d at 1274–75 (same). In the case at bar, ACCPC's refusal to relinquish receivership assets to the Receiver will unquestionably disrupt the court's power to enforce the permanent injunction to which the parties recently stipulated. Among other things, the stipulated judgment provided for redress to consumers. As a result, the judgment herein "inures to the benefit of a large class of persons." *Hall,* 472 F.2d át 266. Like the alleged contemnor in *Hall,* ACCPC's activities "threaten[ ] both plaintiffs' right and the defendant's duty as adjudicated in the [instant] litigation." *Id.* at 265. If the court cannot compel ACCPC to turn over assets in its possession belonging to the receivership estate, the Receiver will be unable to provide adequate redress to consumers who have been defrauded by Defendants. Because ACCPC's conduct imperils the court's ability to render an effective judgment, the court may properly enjoin it, even though it is not a party to the action. *Cf. Paccione,* 964 F.2d at 1274–75.

---

**10.** "Once all of the misdirected deposits and reserves are returned to the receivership, I will be in a position to pay all of the custom-

ers and close out the receivership." Supp. Montgomery Decl. ¶ 6.

## C. *ACCPC's Noncompliance with the Order*

At issue here are Sections VII and VIII of the court's Preliminary Injunction Order. Section VII directs the "defendants, or any other person or entity [to] transfer or deliver possession, custody and control of [all assets of the receivership defendant] to the receiver." Pl.'s Ex. 1, at 24. Section VIII directs "all banks, broker-dealers, savings and loans, escrow agents, title companies, commodity trading companies, or other financial institutions [to] cooperate with all reasonable requests of the receiver relating to implementation of this Order, including transferring funds at his [sic] direction and producing records related to the assets of the receivership defendant." *Id.* at 25–26.

"[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt." *Spallone v. United States,* 493 U.S. 265, 276, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990) (quoting *Shillitani v. United States,* 384 U.S. 364, 368, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966)); *accord Waffenschmidt v. MacKay,* 763 F.2d 711 (5th Cir.1985) ("Courts possess the inherent authority to enforce their own injunctive decrees."). A party may be held in civil contempt where it "fail[ed] to take all reasonable steps within the party's

power to comply [with a specific and definite court order]." *In re Dual–Deck Video Cassette Recorder Antitrust Litigation,* 10 F.3d 693, 695 (9th Cir.1993). Willfulness is not an element of contempt. *Id.* ("there is no good faith exception to the requirement of obedience to a court order"). The party moving for a civil contempt order must show by clear and convincing evidence that the alleged contemnor violated the court's order. *Id.; United States v. Ayres,* 166 F.3d 991, 994 (9th Cir.1999).[11]

[20] " 'Substantial compliance' with the court order is a defense to civil contempt, and is not vitiated by 'a few technical violations' where every reasonable effort has been made to comply." *In re Dual–Deck Video Cassette Recorder Antitrust Litigation,* 10 F.3d 693, 695 (9th Cir.1993); *accord Vertex Distributing, Inc. v. Falcon Foam Plastics, Inc.,* 689 F.2d 885 (9th Cir.1982) ("It is clear that substantial compliance with the terms of a consent judgment is a valid defense to a charge of . . . civil contempt.").[12]

It is undisputed that ACCPC has not fully complied with the court's Preliminary Injunction Order. ACCPC does not contest that it holds receivership assets for which it has not properly accounted. ACCPC maintains that contempt sanctions are unwarranted, however, because it has made significant efforts to comply with the Order. Opp., at 11.[13] The FTC disputes

---

**11.** *Cf. Peterson v. Highland Music, Inc.,* 140 F.3d 1313, 1323 (9th Cir.1998) (*"Beyond finding contempt,* the court may impose a *sanction for the contempt* only if it finds that the party requesting the sanction has proven contempt by clear and convincing evidence." (emphasis added)).

**12.** In *Dual–Deck,* the appellant was originally found in contempt for using discovery from its earlier lawsuit to support a later lawsuit, in violation of a protective order that prohibited "any use 'whatsoever' of information obtained in discovery except for preparation and trial of 'this action.'" *Id.* at 694–95. The Ninth Circuit reversed, finding that despite "its harmless technical violations," the al-

leged contemnor had substantially complied with a reasonable interpretation of the protective order. *Id.* at 695. The *Dual–Deck* court reasoned that "if taken literally, the order would be absurd" because "lawyers who learn from and use their experience obtained in discovery under such an order would have to change fields, and never do antitrust work again." *Id.* at 695. ACCPC has not argued that the Preliminary Injunction Order is overbroad, impossible to comply with, or "absurd."

**13.** Significantly, ACCPC does not allege a present inability to comply. *Cf. Ayres,* 166 F.3d at 994 ("An alleged contemnor may de-

this contention, citing ACCPC's failure to remit the misdirected deposits and to provide a proper accounting. Reply, at 8.[14] For the reasons set forth below, the court finds clear and convincing evidence that ACCPC has not substantially complied with either Section VII or Section VIII of the court's Order.

1. *Section VII*

 Section VII, mandating the delivery of receivership assets to the Receiver, applies to "defendants or any other person or entity." Pl.'s Ex. 1, at 14. The FTC contends that ACCPC has violated Section VII of the Preliminary Injunction Order by refusing to turn over to the Receiver substantial funds belonging to the receivership estate, despite numerous requests. Mot., at 8. ACCPC admits that it has not transferred "possession, custody, and control" of all assets of the receivership defendants to the Receiver, as required by the Order. Opp., at 2 ("ACCPC agrees that it has control of certain funds that arguably constitute part of the receivership estate.").

Two types of assets are at issue: the misdirected deposits and the reserves. Mot., at 8 (discussing both the misdirected deposits and the reserves as assets of the receivership estate). As to the former, ACCPC insists that it is "still attempting to sort out which funds should be characterized as reserve funds and which funds stem from misdirected deposits." Opp., at 4–5. As to the latter, ACCPC contends

that "is legally and contractually required to hold the reserve funds for a minimum of eighteen months, because that is the length of time during which charge-backs may occur." Opp., at 3 (citing Cousins Decl. ¶ 4).

1. *Misdirected Deposits*

ACCPC admits that certain Equifax deposits intended for the receivership defendants were redirected to ACCPC's account. Opp., at 4.[15] The $182,887.18 plus interest demanded by the FTC represents the amount of misdirected deposits only, and excludes any reserves that remain in ACCPC's possession. Madnick Decl. ¶ 10 ("These amounts are in addition to any reserve held by ACCPC."); Pl.'s Ex. 9, at 158 (letter from Receiver to counsel for ACCPC demanding payment of $106,175.95 in Foreclosure funds and $76,711.23 in Productive funds that had been deposited by Equifax in ACCPC's account). ACCPC became aware of these misdirected deposits on or about September 29, 2000. To date, ACCPC has offered no evidence to refute the FTC's assertion that the misdirected deposits total $182,887.18.

Instead, ACCPC contends that it is "still attempting to sort out which funds should be characterized as reserve funds and which funds stem from misdirected deposits." Opp., at 4–5. However, there can be no confusion on this score, because the misdirected deposits, by definition, are

---

fend against a finding of contempt by demonstrating a present inability to comply.").

14. The FTC asserts that "the record is replete with evidence" of ACCPC's lack of cooperation with the Receiver and defiance of the court's Order. Reply, at 5. Specifically, the FTC complains that six months have elapsed since ACCPC received notice of the Preliminary Injunction Order, and "the misdirected deposits still have not been turned over, a proper accounting has not been made, and no

response has been given to the Receiver's letter raising the problems with the accounting provided. In the meantime, ACCPC has been deducting fees from the accounts in violation of the Order." Reply, at 9.

15. While most of the funds characterized as misdirected deposits were redirected to ACCPC's account after Productive and Foreclosure's accounts had been frozen, some were diverted to ACCPC prior to the asset freeze.

funds that Equifax intended to deposit in the receivership defendants' accounts. By contrast, the reserve funds are amounts withheld by Equifax and forwarded to ACCPC to cover chargebacks. The amounts of the misdirected Equifax deposits have been documented and are readily ascertainable. Pl.'s Ex. 4, at 78–88. As a result, ACCPC has no excuse for withholding those amounts from the Receiver.

ACCPC concedes that it holds approximately $80,000 in reserves for Productive and Foreclosure. Opp., at 5 n. 1.[16] Counsel for ACCPC states on information and belief that "ACCPC is legally and contractually required to hold the reserve funds for a minimum of eighteen months." Cousins Decl. ¶ 4. ACCPC provided no supporting documentation for this claim. According to the document entitled "Monetary Reserve Addendum" provided by the FTC, ACCPC agreed to return the reserve funds "six (6) months after termination of the merchant agreement." Supp. Montgomery Decl., Ex. 16, at 51. Six months have elapsed since the defendant companies were placed in receivership, yet ACCPC has refused to turn over the reserve funds. The sole parties to the Monetary Reserve Addendum are ACCPC and the receivership defendants, and the latter are bound by the court's Preliminary Injunction Order.[17] In short, ACCPC's asserted reasons for refusing to turn over the reserves are unavailing. See Peterson, 140 F.3d at 1323 (district court's reasons for finding alleged contemnor's excuses unavailing was supported by the record). Accordingly, the court finds clear and convincing evidence that ACCPC did not make "every reasonable effort" to comply

with Section VII of the Preliminary Injunction Order. In re Dual–Deck, 10 F.3d at 695.

2. Section VIII

ACCPC argues that Section VIII of the Preliminary Injunction Order, requiring cooperation with the receiver with respect to the transfer of funds and production of records, applies to financial institutions only, and the FTC has not established that ACCPC is a "financial institution." Pl.'s Ex. 1, at 25–26. The FTC claims that Section VIII necessarily includes merchant account holders such as ACCPC, "because the provision is intended to reach receivership defendant funds held in accounts by third parties, e.g. escrow agents." Reply, at 4.

■■■ The court finds ACCPC's argument that it does not fall within the scope of Section VIII without merit. First, Section VIII applies to "all banks, broker-dealers, savings and loans, escrow agents, title companies, commodity trading companies, [and] other financial institutions." Pl.'s Ex. 1, at 25–26. ACCPC admits that it "is in the business of brokering agreements between credit card processors and merchants." Opp., at 3. Because Section VIII of the Preliminary Injunction Order defines the term "financial institution" to include "broker-dealers" such as ACCPC, ACCPC must comply with its mandates.

■■■ Moreover, court orders must be read in light of their stated purpose. See In re Dual–Deck, 10 F.3d at 695 ("For the protective order to comply with common sense, a reasonable reading must connect its prohibitions to its purpose."). The pur-

---

16. ACCPC states that its reserves for the Productive and Foreclosure accounts totaled $190,000 as of June 2000, but since then it has paid $110,000 to cover chargebacks, including $40,000 to the Receiver. Opp., at 5 n. 1.

17. Although the record includes only the agreement between the ACCPC and Foreclosure, the court assumes for purposes of this motion that ACCPC and Productive executed a similar agreement.

pose of the court's Preliminary Injunction Order was to account for and to preserve the assets of the receivership estate. An overly restrictive definition of "financial institution" or "broker-dealer" does not advance this purpose. The only interpretation of Section VIII that is consistent with the objective of the injunction is one that would allow it to reach entities that hold assets of the receivership defendants, such as ACCPC. Accordingly, the court concludes that Section VIII of the Preliminary Injunction Order is enforceable against ACCPC.[18]

As noted above, Section VIII mandates "cooperat[ion] with all reasonable requests relating to implementation of [the] Order," including the production of "records related to the assets of the receivership defendants." Pl.'s Ex. 1, 26. Pursuant to this Section, the Receiver sought a complete accounting of any payments to ACCPC from Equifax or the receivership defendants for the period January 1, 2000 through July 31, 2000. Pl.'s Ex. 5, at 118. Although the Receiver made this request in August 2000, ACCPC did not promptly respond.[19] In contrast, the Receiver made a similar request to Card Payment Systems ("CPS"), and CPS sent the Receiver a detailed accounting within two days of her request. Supp. Montgomery Decl. ¶ 5.[20]

After a three-month delay, ACCPC faxed the Receiver a ten-page accounting. Pl.'s Ex. 11. ACCPC maintains that its November 21 accounting was the result of considerable effort, including "hundreds of man-hours" spent "review[ing] voluminous

transaction records from several sources." Opp., at 11–12. The FTC claims that ACCPC's November 21 accounting was inadequate, because it omitted certain misdirected deposits of Foreclosure funds and provided insufficient documentation of ACCPC's deductions from the reserves. Pl.'s Ex. 11; Mot., at 6; *accord* Madnick Decl. ¶¶ 12–13. ACCPC does not dispute the FTC's assertion that its accounting was incomplete.

In light of the Receiver's September 29, 2000 letter calling ACCPC's attention to misdirected Foreclosure deposits in the amount of $106,175.95, ACCPC's failure to account for these funds constitutes a gross omission, not a "harmless technical violation." *In re Dual–Deck*, 10 F.3d at 695. Moreover, to the extent ACCPC claims entitlement to any deductions from the reserves, it should be able to justify and substantiate those deductions. Supp. Montgomery Decl., Ex. 17 ("[A]ll of the information you requested [regarding chargebacks for Productive Marketing and Foreclosure Solutions that have been debited from ACCPC's account] is in the possession of ACCPC. Equifax provides deposit adjustments (i.e. chargeback notices) ... to ACCPC daily. On a monthly basis, Equifax provides ACCPC a merchant profitability report that summarizes all merchant transactions for the month."). Because ACCPC has failed to account for certain misdirected deposits and document certain claimed deductions, the court finds that ACCPC has failed to comply with the Receiver's request for an accounting.

---

18. The court further notes that even were ACCPC not bound by Section VIII of the Order, it would still be obligated to comply with Section VII. Because Section VII directs ACCPC to turn over all receivership assets, including the reserve funds, ACCPC would be required to provide an accounting of those assets, to credibly claim an entitlement to any deductions from the reserves.

19. ACCPC's dilatory tactics led the Receiver to complain that "Mr. Oser has been evasive and uncooperative." Pl.'s Ex. 9, at 158.

20. CPS is the company that processed credit card transactions for Productive until May 2000. Supp. Montgomery Decl. ¶ 5.

▇ Finally, ACCPC points to its deposit of $40,000 in the receivership defendants' account as an example of its alleged good faith cooperation with the Receiver, and complains that "the Receiver has not provided ACCPC with an accounting to establish which chargebacks were paid with this $40,000." Opp., at 5, 11. However, good faith is not a defense to a motion for contempt. *See Peterson,* 140 F.3d at 1322 (quoting *In re Dual–Deck,* 10 F.3d at 695). Moreover, ACCPC was obligated to fund those chargebacks pursuant to its contract with Productive and Foreclosure, and had directed Equifax to deduct a percentage of the original charges for that very purpose. ACCPC Opp., at 11. Even assuming *arguendo* that the Receiver had an obligation to account for the funds she received from ACCPC, any alleged failure to do so would not excuse ACCPC's noncompliance with the court's Preliminary Injunction Order. In any event, it is undisputed that the Receiver sent counsel for ACCPC copies of bank account statements showing that Equifax withdrew the funds in question from the account established by the Receiver, and any records reflecting customer names, credit card numbers, and refund amounts sought by ACCPC were available from Equifax. Supp. Montgomery Decl. ¶ 3c.

The record before the court thus establishes, by clear and convincing evidence, that ACCPC "fail[ed] to take all reasonable steps within [its] power to comply" with the Preliminary Injunction Order. *In re Dual–Deck,* 10 F.3d at 695. Accordingly, contempt sanctions are warranted.

### D. *Evidentiary Hearing*

In its opposition, ACCPC requested an evidentiary hearing and an opportunity to cross-examine Plaintiff's declarants. Opp., at 12.[21] Although ACCPC presented no admissible evidence contesting the factual basis underlying the FTC's motion for contempt, the court granted ACCPC's request. *See* January 25, 2000 Minute Order. However, at the February 21, 2001 hearing on this matter, counsel for ACCPC elected to devote his time to oral argument rather than live testimony.

### E. *Sanctions*

The FTC seeks an order holding ACCPC in contempt and compelling ACCPC to turn over all receivership assets plus interest to the Receiver, and to

---

**21.** Ordinarily, "a district court should not impose contempt sanctions solely on the basis of affidavits." *Peterson v. Highland Music, Inc.,* 140 F.3d 1313, 1324 (9th Cir.), cert. denied, 525 U.S. 983, 119 S.Ct. 446, 142 L.Ed.2d 401 (1998); *cf. Pennwalt Corp. v. Durand–Wayland, Inc.* 708 F.2d 492, 495 (9th Cir.1983) (court erred in sanctioning a nonparty for failure to comply with a subpoena without holding a hearing on the propriety and reasonableness of the fee award). However, the Ninth Circuit has "repeatedly held that finding a party in civil contempt without a full-blown hearing does not deny due process to a contemnor." *United States v. Ayres,* 166 F.3d 991, 994 (9th Cir.1999) ("Because civil contempt sanctions are viewed as nonpunitive and avoidable, fewer procedural protections for such sanctions have been required." (quoting *United Mine Workers of Am. v. Bagwell,* 512 U.S. 821, 831, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994))). This is especially true where the affidavits offered by the moving party are uncontroverted. *See Peterson,* 140 F.3d at 1324 (court's failure to hold evidentiary hearing did not deny due process where defendants did not "describe[ ] any new evidence that they could present at a hearing, nor any existing evidence that they would challenge, if such a hearing were to be ordered."); *accord Thomas, Head & Greisen Employees Trust v. Buster,* 95 F.3d 1449, 1458 (9th Cir.1996) (failure to hold evidentiary hearing prior on motion for contempt order did not violate due process); *Morales–Feliciano v. Parole Bd. of the Commonwealth of Puerto Rico,* 887 F.2d 1, 6–7 (1st Cir.1989) (court's failure to hear oral argument before holding party in contempt did not offend due process where there were "no disputed factual matters that required an oral proceeding").

"provide a full and accurate accounting of all receipts and disbursements relating to [Productive and Foreclosure]," together with any supporting documentation.[22] Mot., at 2, 8; Madnick Decl. ¶¶ 10–11. The FTC also seeks a compensatory fine of $16,246.25 for the efforts expended by the Receiver to obtain the funds at issue,[23] and a coercive sanction of $50 for the first day of noncompliance, with that amount doubling for each additional day. Mot., at 2.

 "Sanctions in civil contempt are permitted for two purposes: (1) to coerce defendant into compliance with the court's order; and (2) to compensate the complainant for losses sustained as a result of the contumacious behavior." *Dystar Corp. v. Canto*, 1 F.Supp.2d 48, 58 (D.Mass.1997) (citing *United States v. United Mine Workers*, 330 U.S. 258, 303–04, 67 S.Ct. 677, 91 L.Ed. 884 (1947)). Courts have "longstanding authority . . . to enter broad compensatory awards for all contempt through civil proceedings." *United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 838, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994). However, compensatory sanctions are "limited to the actual damages suffered by the injured party as a result of the violation of the injunction." *G. & C. Merriam Co. v. Webster Dictionary Co., Inc.*, 639 F.2d 29, 41 (1st Cir. 1980). The receivership estate incurred $16,246.25 in damages, consisting of accountant and receiver fees, due to ACCPC's noncompliance with the court's Order. Madnick Decl. ¶ 13; Montgomery Decl. ¶ 26. In light of the six-month delay and attendant costs caused by ACCPC's intransigence, the courts finds these fees reasonable. Accordingly, the court *grants* the compensatory sanction sought by the FTC.

 "Civil contempt sanctions . . . are only appropriate where the contemnor is able to purge the contempt by his own affirmative act and 'carries the keys of the prison in his own pocket.'" *Ayres*, 166 F.3d at 997 (quoting *Bagwell*, 512 U.S. at 828, 114 S.Ct. 2552). Here, imposition of the proposed per diem fine will provide an incentive for ACCPC to comply with the court's Order. Therefore, it is coercive in nature. *Cf. Ayres*, 166 F.3d at 994 (sustaining imposition of per diem fine as properly intended to coerce compliance, rather than punish the contemnor). In its opposition, ACCPC sought "the opportunity to purge the contempt by complying with the Court['s] order," before the court imposed sanctions. Opp., at 12. However, at the conclusion of the February 21, 2001 hear-

---

22. Based on his review of the Equifax documents and bank statements, Sanford J. Madnick, the principal accountant for the receivership estate, determined that as of June 22, 2000, ACCPC held $106,175.95 in Foreclosure funds and $76,711.23 in Productive funds *in addition to any reserve.* Madnick Decl. ¶ 10. Although local counsel for ACCPC claims that the Receiver led him to understand that the misdirected deposits equaled $10,096.60 for Foreclosure and $7,440.46 for Productive, the Receiver flatly denies making any such representation. Heisner Decl. ¶ 4; Supp. Montgomery Decl. ¶ 3a (On January 8, 2001, "I informed Mr. Heisner that the misdirected deposits for Foreclosure totaled approximately $106,000 and the misdirected deposits for Productive

totaled approximately $76,000. . . . I never suggested to Mr. Heisner that the misdirected deposits were limited to $10,096.60 for Foreclosure and $7,440.46 for Productive."). Counsel for ACCPC now admits that he may have mistakenly identified these figures as misdirected deposits rather than refund payments to customers in his notes of the January 8 conversation. Supp. Heisner Decl. ¶ 7.

23. According to the Receiver, this sum represents amounts incurred through December 2000. Mot., at 6 ("To date, accounting and receivership expenses incurred by the Receiver amount to $16,246.25."); Montgomery Decl. ¶ 26 (receiver fees); Madnick Decl. ¶ 14 (accountant fees).

ing on this motion, counsel for ACCPC declined to reaffirm his client's intention to purge its contempt through compliance. Accordingly, the court imposes a per diem fine of $50 for the first day of noncompliance, with the amount doubling for every additional day of noncompliance, payable to the United States through the Clerk of the Court for the Central District of California.

## IV. CONCLUSION

For the reasons stated above, the court *grants* the FTC's request for an order holding ACCPC in civil contempt of court. See accompanying order, filed Feb. 22, 2001.

IT IS SO ORDERED.